THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* STEEPLECHASE PARK COMPANY et al., Appellants, Impleaded with Another.

Water and watercourses — when and how title to lands under navigable waters vested in the state — power of state to grant title to lands under water — patent for lands under water — when it cannot be invalidated in a collateral action.

1. The title to the bed of navigable streams and the control of navigable waters are vested in the state subject to the limitations found in the Federal Constitution. The state, except for such limitations, has power to grant the title to lands under water, unconditionally or conditionally, or it may grant special rights therein, or it may restrict the boundaries of navigable waters by defining the same.

2. The power of the commissioners of the land office to grant lands under water in fee is given by the Constitution and the statute (Const. art. V, §§ 5, 6; Pub. Lands Law, § 75).

3. In an application for a grant of lands under water made pursuant to the statute, the petitioner not only stated in general terms her desire to purchase the lands therein specifically described, but she expressly stated that it was her intention "to apply for an absolute title in fee simple to said lands under water." The grant by the commissioners of the land office contained this clause: "We have given and granted, and by these presents do give and grant unto (the petitioner), her heirs and assigns, the land under water, and between high and low water mark, described as follows, to wit." *Held,* that the grant is unqualified in form and conveyed an exclusive right to the possession of the premises therein described.

4. A patent for lands under water cannot be invalidated in a collateral action by proof that it was granted for other purposes than to promote the commerce of this state. The validity can only be assailed in a direct proceeding to review the action of the commissioners or by an action in equity to set aside the patent. Hence, the propriety or validity of a grant by the state cannot be attacked in an action for an injunction but only in a suit to review the action of the commissioners of the land office or to set aside or amend the grant.

*People* v. *Steeplechase Park Co.*, 165 App. Div. 231, modified.

(Argued April 24, 1916; decided July 11, 1916.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered January 6, 1915, affirming a judgment in favor of plaintiff entered upon a decision of the court on trial at Special Term.

The defendants, or one or more of them, are in possession of certain real property at Coney Island, in the county of Kings, extending from an avenue known as Surf avenue, southerly to high-water mark of the Atlantic ocean, a distance of about 845 feet on the westerly side thereof, and about 757 feet on the easterly side thereof. Said real property is about 633 feet wide and extends approximately from the westerly boundary of West Nineteenth street on the west to the easterly boundary of West Sixteenth street on the east. On this real property an amusement park is maintained.

The defendant Huber is found to be the owner of the fee of 297.71 feet in width of said real property along the westerly side thereof extending from high-water mark to Surf avenue. The defendant Steeplechase Company is found to be the owner of the fee of 148.63 feet in width of the real property adjoining on the east the said real property owned by the defendant Huber and which real property extends from high-water mark to Surf avenue.

The defendants Tilyou and Hogg are the owners of the fee of a part of said real property adjoining on the east

the parcel owned by the Steeplechase Company which part so owned by them is 131.11 feet wide and extends from high-water mark to said Surf avenue.

It does not appear who is the owner of the fee of the remaining about 56 feet in width of said real property making up the 633 feet in width referred to as extending from said high-water mark to Surf avenue. The land between high-water mark and low-water mark fronting the lands owned as aforesaid is 122 feet wide at the westerly end thereof — 125 feet wide measured from the middle of said park — and 133 feet wide measured from the easterly side of said park. It does not appear that the state has ever granted the lands under water south of and opposite that part of the real property owned by the defendants Tilyou and Hogg, or that part of the real property described as adjoining their lands on the east.

The defendant Huber, on the 7th day of May, 1897, made application to the commissioners of the land office of this state for a grant of land under water adjacent to the property found to be owned by her in fee. On October 4, 1897, a grant was made to her of which the following is a copy:

" The People of the State of New York, by the Grace of God Free and Independent. To All to Whom These Presents Shall Come, Greeting:

" *Know Ye*, That, pursuant to a resolution of the Commissioners of our Land Office, dated the thirtieth day of September, 1897, we have given and granted, and by these presents do give and grant unto Emilie Huber, her heirs and assigns, the land under water, and between high and low water mark, described as follows, to wit:

" All that certain piece or parcel of land under waters of the Atlantic Ocean, in front of and adjacent to upland of said Emilie Huber at Coney Island in the city of Brooklyn in our county of Kings described as follows, to wit:

"Beginning at a point on the mean high water line of the Atlantic Ocean, where the same is intersected by the division line between old lot number twenty-eight and old lot number thirty-one of the Common Lands of the Town of Gravesend, said division line between the westerly line of the upland of Emilie Huber, and said point of intersection being located eight hundred and sixty-seven and thirty-three one-hundredths feet southerly from the southerly line of Surf Avenue, measured along said division line; running thence on a line parallel with West Nineteenth street south twenty-nine minutes, thirty seconds east fifteen hundred feet; thence north eighty-nine degrees, thirty minutes and thirty seconds east two hundred ninety-seven and seventy one-hundredths feet; thence on a line parallel with West Nineteenth street, north twenty-nine minutes, thirty seconds west fifteen hundred feet to mean high water line; thence along said mean high water line south eighty-nine degrees, thirty minutes thirty seconds west two hundred ninety-seven and seventy one-hundredths feet to the place of beginning, containing ten and one-fourth acres.

"*In Testimony Whereof*, We have caused these our Letters be made Patent, and the Great Seal of our said State to be hereunto affixed.

"*Witness*,          FRANK S. BLACK,
          Governor of our said State, at our City of
"[SEAL]  Albany, the fourth day of October, in the year of our Lord one thousand eight hundred and ninety-seven.

"FRANK S. BLACK,

"Passed the Secretary's Office the 4th day of October, 1897.

"ANDREW DAVIDSON,
"*Deputy Secretary of State.*"

Paul Weidmann, the predecessor in title of the defendant Steeplechase Company, on the 2d day of February,

1916.]                    Statement of case.            [218 N. Y.]

1898, obtained a grant from the commissioners of the land office, the material part of which is as follows:

"The People of the State of New York, by the Grace of God Free and Independent. To All to Whom These Presents Shall Come, Greeting:

"*Know Ye,* That we have given and granted and by these presents do give and grant unto Paul Wiedmann, his heirs and assigns, the land under water and between high and low water mark described as follows to wit: * *. * Containing five and one-eighth acres.

"Subject, however, to the restriction that the said party of the second part shall not erect or cause to be erected any fences or obstructions of any kind on the land under water as above described that will in any way obstruct or prevent any person or persons from having free and unmolested rights to cross and recross the said land under water between high and low water line as they now exist or as they may exist to the south of the said present high or low water line, but this restriction shall not apply to any of the lands under water which shall at any time be reclaimed by natural causes and building erected thereon."

In the year 1905 and thereafter the defendant Steeplechase Company erected upon said foreshore and have since there maintained obstructions of many kinds which interfered with and prevented the use of the foreshore by the public. The court found as a fact that the obstructions, naming them, are purprestures and nuisances *per se.*

It is also found as a fact that for upwards of one hundred years last past the plaintiffs have had and now have the right to use the foreshore adjacent to Steeplechase Park at all times for the purpose of bathing, boating and fishing and the right of passage over such foreshore as incidental thereto. This action is brought to prevent the defendants from interfering with the plaintiffs in their right of passage over and use of such fore-

shore.   Judgment was obtained in the action by which it is ordered and adjudged: "That the defendants are enjoined from maintaining the following structures, namely, the fences or barriers at either side of Steeplechase Park, the luncheon pavilion and the platform connecting the same with the pier, the roller coaster and marine horse railway, in so far that these structures or any of them project beyond the present high water line as shown on Plaintiff's Exhibit 12.

"*It Is Further Ordered and Adjudged :* That said defendants make suitable means of free passage and maintain the same under the pier; that the pipe under said pier be raised to a height of at least seven feet above the beach between high and low water line; that said defendants provide convenient means for passing over or around the landward end of the westerly jetty for foot passengers or vehicles, which passage must be left open for all persons freely to travel over; that the said defendants also make and maintain a suitable and convenient means for passage under Tilyou's Walk by persons on foot and for vehicles at all states of the tide.

"*It Is Further Ordered and Adjudged :* That said defendants forthwith and within thirty days after service upon them or their attorneys of a copy of this judgment, remove the following structures, namely: the easterly boundary fence, the fences upon the westerly jetty, the luncheon pavilion, the platform connecting the same with the pier, the roller coaster and marine horse railway, in so far as these structures, or any of them, project beyond the present high water line as shown on Plaintiff's Exhibit 12; and within said thirty days make a free passage under the pier, raise the pipe underneath it to a height of at least seven feet above the beach between high and low-water line, provide convenient means for passing over the westerly jetty or around the landward end for foot passengers or vehicles and provide suitable and convenient means for passage underneath Tilyou's

Walk by persons on foot and for vehicles at all states of the tide."

An appeal was taken from said judgment by the defendants, other than the defendant Hogg, to the Appellate Division of the Supreme Court, where the judgment was unanimously affirmed, and this appeal is taken from such judgment of affirmance.

The defendants Emilie Huber and George C. Tilyou have died since the commencement of this action and the executor of the will of each has been substituted in the action in place of such defendants severally. The interest of each has been referred to in this statement and will be referred to in the opinion as if the original parties had not died.

*C. Walter Randall, Samuel S. Whitehouse* and *Frank Oberneir* for Joseph Huber, as executor of Emilie Huber, appellant. As owner of upland Emilie Huber had the right of user of foreshore adjacent to her property, regardless of any grant and subject only to the rights of the public for passage, bathing and fishing. (*Rumsey* v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 79; *Town of Brookhaven* v. *Smith*, 188 N. Y. 74; *People* v. *Mould*, 37 App. Div. 35; *Barnes* v. *Midland R. R. Terminal Co.*, 193 N. Y. 378.) The state had the right through the commissioners of the land office to grant to Emilie Huber the unrestricted beneficial use and enjoyment of land under water adjoining her property to the exclusion of the general public. (*Lansing* v. *Smith*, 4 Wend. 9; *Gould* v. *Hudson River R. R. Co.*, 6 N. Y. 522; *Furman* v. *City of New York*, 10 N. Y. 467, 468; *People* v. *Tibbetts*, 19 N. Y. 525; *Trustees of Brookhaven* v. *Strong*, 60 N. Y. 56; *People* v. *N. Y. & S. I. Ferry Co.*, 68 N. Y. 71; *Towle* v. *Remsen*, 70 N. Y. 303; *Langdon* v. *Mayor, etc.*, 93 N. Y. 129; *Mayor, etc.*, v. *Hart*, 95 N. Y. 443; *Knick. Ice Co.* v. *Schultz*, 116 N. Y. 382; *Rumsey* v. *N. Y. & N. E. R. Co.*, 130 N. Y. 88; *New York, etc., R. Co.* v.

*Aldridge,* 135 N. Y. 83; *Webber* v. *Harbor Commissioners,* 18 Wall. 57; *Hoboken* v. *Penn. R. R. Co.,* 124 U. S. 656; *Illinois Central R. Co.* v. *Illinois,* 146 U. S. 387.) The grant acquired by Emilie Huber for exclusive beneficial use of land under water adjacent to her upland was acquired in the manner prescribed by law. The full consideration fixed by the state was paid and, the grant never having been revoked, she is entitled to rely upon it and exercise the rights thereby conveyed to her. (*Nicoll* v. *N. Y. & Erie R. Co.,* 12 N. Y. 128; *Crain* v. *Wright,* 114 N. Y. 310; *Clapp* v. *Byrnes,* 3 App. Div. 280; *Bates* v. *Virolet,* 33 App. Div. 410; *Furman* v. *City of New York,* 10 N. Y. 569; *Boreal* v. *Mayor, etc.,* 2 Sandf. 557; 68 N. Y. 552; *Brookhaven* v. *Strong,* 60 N. Y. 56; *Langdon* v. *Mayor, etc.,* 93 N. Y. 147; *Roe* v. *Strong,* 107 N. Y. 558; *De Lancey* v. *Piepgras,* 138 N. Y. 36; *Matter of Mayor, etc.,* 182 N. Y. 365; *Fulton L., H. & P. Co.* v. *State,* 62 Misc. Rep. 194; 200 N. Y. 416; *Bardes* v. *Herman,* 144 App. Div. 779; 207 N. Y. 745.)

*Andrew F. Vun Thun, Jr.,* for Steeplechase Company et al., appellants.

*Egburt E. Woodbury, Attorney-General* (*Robert P. Beyer* of counsel), for respondent. The People of the state of New York own the foreshore at Coney Island and have the right to use the beach for fishing, bathing and boating, to all of which the right of passage is a necessary incident. (*Attorney-General* v. *Burridge,* 10 Price, 350; Callie on Sewers, 55; *Coxe* v. *State,* 144 N. Y. 396; *Illinois Central R. R. Co.* v. *Illinois,* 146 U. S. 387; *People* v. *N. Y. & Staten Island Ferry Co.,* 68 N. Y. 71; *Matter of City of New York,* 168 N. Y. 134; *Brookhaven* v. *Smith,* 188 N. Y. 74; *Barnes* v. *Midland Railroad Ter. Company,* 193 N. Y. 375; *Town of Easthampton* v. *Kirk,* 84 N. Y. 215; *De Lancey* v. *Piepgras,* 138 N. Y. 26; *Sage* v. *Mayor, etc.,* 154 N. Y. 61.) The grant to Huber

must be exercised consistently with the right of passage. (*Gould* v. *H. R. R. R. Co.*, 6 N. Y. 522; *Kerr* v. *W. S. R. R. Co.*, 127 N. Y. 269; *People* v. *Tibbetts*, 19 N. Y. 529; *People* v. *Canal Appraisers*, 33 N. Y. 461; *Rumsey* v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 79; *Smith* v. *City of Rochester*, 92 N. Y. 463; *Matter of Long Sault Development Co.*, 212 N. Y. 1; *People* v. *N. Y. & S. I. F. Co.*, 68 N. Y. 71; *Coxe* v. *State*, 144 N. Y. 396; *Thousand Island Steamboat Co.* v. *Visger*, 179 N. Y. 206.)

CHASE, J. So far as the judgment recovered relates to obstructions upon land below high-water mark other than land which is included within the description in the patent to Emile Huber of 1897, it is fully sustained by the findings of fact included in the record, and by the law as stated by this court in many reported cases. Among such cases are *Town of Brookhaven* v. *Smith* (188 N. Y. 74); *Barnes* v. *Midland R. R. Ter. Co.* (193 N. Y. 375); *Barnes* v. *Midland R. R. Ter. Co.* (218 N. Y. 91.)

The defendants are not entitled to maintain the obstructions erected by them below high-water mark adjacent and seaward from the Huber uplands because of any littoral rights in the owner of such upland. (See authorities last cited.) Their right, if any, to maintain such obstructions adjacent to said upland rests wholly upon the grant to Mrs. Huber of 1897. It is necessary, therefore, to consider the *language* of the grant, the *intention* of the commissioners of the land office in making the grant, their *power* and *authority* to make the grant and the power and authority of the state to *authorize* a grant conveying every interest of the state, *jus privatum* and *jus publicum*, in lands below high-water mark. The cases last cited have no special bearing upon the questions relating to the Huber grant. The Huber grant is in the simplest form, absolute in terms, and by

express words gives and grants all of the land adjacent to the applicant's upland from high-water mark southward for fifteen hundred feet.

It is provided by statute that all letters patent shall be in such form as the commissioners of the land office direct. (Public Lands Law, § 5.)

The intention of the commissioners of the land office in executing the grant to Mrs. Huber is quite conclusively shown by the proceedings before them upon her application for the grant. In her application for the grant, made pursuant to the statute, she not only stated in general terms her desire to purchase the lands therein specifically described, but she expressly stated that " it is the intention of the undersigned (Mrs. Huber) to apply for an absolute title in fee simple to said lands under water." It appears from the minutes of the land board that her application was referred to the state engineer and surveyor, a member of the board, and that he reported adversely to her application. The matter was then, upon motion, laid upon the table, and at a subsequent meeting, after a report from the comptroller as to the value of the property in which he stated " that said land, containing 10¼ acres, is appraised at $580.00 for restricted, and at $871.25 for all beneficial enjoyment; and that the appraiser's report, and his bill and receipt for $8.05 for expenses incurred in making the appraisal, are enclosed herewith. In my opinion $30.00 in addition to above costs of appraisal should be charged for appraising said land," — a motion was adopted by a vote of two to one (the state engineer and surveyor voting no) that letters patent issue to Mrs. Huber on presentation of the treasurer's receipt in accordance with the appraisal. Mrs. Huber then paid $909.30, made up of $871.25, the appraisal for " all beneficial enjoyment," $30 costs of appraisal, and $8.05, expenses incurred in making the appraisal, and the grant was executed and delivered.

It appears, therefore, that the commissioners of the land

office intended to give Mrs. Huber an unrestricted fee of the lands included in the grant. If it had been their intention to reserve to the public a right of passage over the lands included in the grant, they would have provided therefor as they did in the grant to Paul Weidmann a few weeks later.

The pier which constitutes one of the obstructions of which the plaintiff complains was built by the permission of the secretary of war of the Federal government, which permission is dated November 10, 1913, and also by permission of the department of docks and ferries of the city of New York, which permission is dated December 18, 1903.

By chapter 67 of the Laws of 1786 the commissioners of the land office, then composed of the governor, lieutenant-governor, speaker of the assembly, secretary of state, attorney-general, treasurer and auditor, were given authority " to grant such and so much of the lands under water of navigable rivers, as they shall deem necessary to promote the commerce of this state. Provided always that no such grant shall be made in pursuance of this act to any person whatever other than the proprietor or proprietors of the adjacent lands." That statutory authority was practically re-enacted in the Revised Laws of 1813 (Vol. 1, page 292, chap. 74) and in the Revised Statutes of 1830 (Part 1, chap. 9, title 5, articles 1 and 4). Many other statutes were passed relating to the commissioners of the land office and their duties, and also authorizing grants to particular persons, municipal and other corporations, ever enlarging the power and authority of the commissioners to act for the state in granting lands under water as stated, and otherwise.

By the Constitution of 1846, article 5, section 5, the lieutenant-governor, speaker of the assembly, secretary of state, comptroller, treasurer, attorney-general and state engineer and surveyor were made commissioners of the land office and the powers and duties of the board

were stated as follows: "The powers and duties of the respective boards, and of the several officers in this article mentioned, shall be such as are now or hereafter may be prescribed by law." (Constitution, art. 5, § 6.) These provisions were included without change in the Constitution of 1894. The commissioners of the land office are, therefore, constitutional officers having by the paramount law of the land constituting the direct voice of the people, such powers and duties as are prescribed by the legislature.

After the Constitution of 1846 the legislature, by chapter 283 of the Laws of 1850, provided: "The commissioners of the land office shall have power to grant in perpetuity or otherwise, so much of the lands under the waters of navigable rivers or lakes, as they shall deem necessary to promote the commerce of this state, or proper for the purpose of beneficial enjoyment of the same by the adjacent owner, but no such grant shall be made to any person other than the proprietor of the adjacent lands." (Section 1.)

By section 2 the powers conferred on the commissioners of the land office were extended "to lands under water, and between high and low-water mark in and adjacent to and surrounding Long Island   *   *   *."

The present statute is section 75 of the Public Lands Law (Cons. Laws, ch. 46), and it is substantially the same so far as now under consideration as it existed prior to 1897. (See Laws of 1894, chapter 317, sec. 70.) It provides: "This section authorizes grants of land under water

"1. Of navigable rivers and lakes.

"2.   *   *   *

"3.   *   *   *

"4.   *   *   *

"5. Adjacent to and surrounding Long Island.   *   *   *

" The commissioners of the land office may grant in perpetuity or otherwise, to the owners of the lands adjacent to

the lands under water specified in this section, to promote the commerce of this state or for the purpose of beneficial enjoyment thereof by such owners, or for agricultural purposes, so much of said lands under water as they deem necessary for that purpose. No such grant shall be made to any person other than the proprietor of the adjacent lands, and any such grant made to any other person shall be void. * * *."

From the first grant, made under the act of 1786 on December 29, 1786, to Esra Reed of lands under the waters of the Hudson river adjacent to his farm at Hudson, down to the present time, thousands of grants have been made, some with, and some without restrictions, some absolute, and some conditional. Upon the faith of the title of lands so conveyed in fee there are now docks, wharves, and buildings devoted to commerce, and also lands filled in, built upon and beneficially enjoyed worth millions of dollars. Titles founded upon such grants are to be found in every city, village and township bordering upon public waters.

In 1892 the attorney-general, replying to a communication of the land board relating to the form of a grant then under consideration, said, in substance, that a grant for beneficial enjoyment imports a fee, and that a provision should not be placed in the grant reserving to the people the privilege of entering upon and using the lands granted until the same shall be actually appropriated and applied to the purposes of commerce or for beneficial enjoyment. (Reports of Attorney-General of the State of New York, 1892, page 83.)

In 1891 the attorney-general, in response to a communication asking for the meaning of the phrases "purposes of commerce" and "beneficial enjoyment," said: "By the amendment of section 67 Revised Statutes *supra* in 1850 (Chapter 283) which conferred power upon the land board to make such grants for beneficial enjoyment, the legislature assumed that grants for purposes of commerce

were of limited character and subject to legislative control. On the other hand a grant for 'beneficial enjoyment' to a grantee, his heirs and assigns, imports a fee and I think the legislature by said amendment of 1850 when it authorized the land board to make grants for beneficial enjoyment, intended a fee should be conveyed where the land granted was not necessary for purposes of commerce. (See Resolution adopted by Land Office March 6th, 1872)." (Reports of Attorney-General of the State of New York, 1891, page 273.)

After the legislation mentioned and the approved practice of the commissioners of the land office in granting lands under water in fee for beneficial enjoyment had continued for many years, the Constitution of 1894 was adopted by the people and the statutes conferring power on the commissioners of the land office have been more than once re-enacted. The power of the commissioners of the land office to grant lands under water in fee seems to have been given by the Constitution and the statutes.

Notwithstanding the grant to Mrs. Huber, the Trial Term and the Appellate Division of the Supreme Court have each held not only that the grant does not operate to deprive the public of the right to pass over the lands granted but that the structures erected upon the lands included in the grant are purprestures and nuisances.

So much has been written in this court in regard to the title to lands under water including the foreshore, that we will refer to some of the conclusions that have been reached in other cases without going independently and at length into a statement of the history and present status of such lands.

"From the earliest times in England the law has vested the title to, and the control over, the navigable waters therein, in the crown and Parliament. A distinction was taken between the mere ownership of the soil under water and the control over it for public purposes. The ownership of the soil, analogous to the owner-

ship of dry land, was regarded as *jus privatum*, and was vested in the crown. But the right to use and control both the land and water was deemed *a jus publicum*, and was vested in Parliament. The crown could convey the soil under water so as to give private rights therein, but the dominion and control over the waters, in the interest of commerce and navigation, for the benefit of all the subjects of the kingdom, could be exercised only by Parliament." (*Commonwealth* v. *Alger*, 7 Cush. 53; *People* v. *N. Y. & S. I. F. Co.*, 68 N. Y. 71.)

In this country the state has succeeded to all the rights of both crown and Parliament in the navigable waters and the soil under them, and here the *jus privatum* and the *jus publicum* are both vested in the state.

In England Parliament had complete and absolute control over all the navigable waters within the kingdom. It could regulate navigation upon them, could authorize exclusive rights and privileges of navigation and fishing, could authorize weirs, causeways and dams for private use to be constructed in them, and could interrupt and absolutely destroy navigation in them. (*Rex* v. *Montague*, 4 B. & C. 598; *Williams* v. *Wilcox*, 8 Ad. & El. 314; *People* v. *N. Y. & S. I. F. Co.*, *supra.*) So in this country each state (subject to limitations to be found in the Federal Constitution) has the absolute control of all the navigable waters within its limits. As said by the chancellor in *Lansing* v. *Smith* (4 Wend. 9, 20), the state through its legislature "may exercise all the powers which previous to the Revolution could have been exercised either by the king alone, or by him in conjunction with his Parliament; subject only to those restrictions which have been imposed by the Constitution of this State or of the United States."

In *Stevens* v. *Paterson & Newark R. R. Co.* (34 N. J. L. 532; 3 Am. Rep. 269), BEASLEY, Ch. J., said (p. 548) that "a legislative permission to appropriate to individual use a part of the *jus publicum*, does not, *per se*, deprive

the public of a right to resume the privilege granted, unless it appears that it was the intention to vest such privilege irrevocably in the licensee;" that (p. 550) "The principle seems universally conceded that, unless in certain particulars protected by the Federal Constitution, the public right in navigable rivers can to any extent be modified or absolutely destroyed by statute." In *Langdon* v. *Mayor, etc., of N. Y.* (93 N. Y. at p. 156) EARL, J., said: "These powers result from its sovereignty and the absolute control which, in consequence thereof, it has over the public domain within its limits. The right to grant the navigable waters is as absolute and uncontrollable (except as restrained by constitutional checks) as its right to grant the dry land which it owns. It holds all the public domain as absolute owner, and is in no sense a trustee thereof, except as it is organized and possesses all its property, functions and powers for the benefit of the people."

The right of the public to use the foreshore in England is very restricted. In *Blundell* v. *Catterall* (5 B. & Ald. 268) it was held not to include the right of bathing. The court in that case, speaking by HOLROYD, J., say (pp. 301, 302): "The public common law rights, too, with respect to the sea, etc., independently of usage, are rights upon the water, not upon the land, of passage and fishing on the sea, and on the sea shore, when covered with water; and though, as incident thereto, the public must have the means of getting to and upon the water for those purposes, yet it will appear that it is by and from such places only as necessity or usage have appropriated to those purposes, and not a general right of lading, unlading, landing or embarking where they please upon the sea shore, or the land adjoining thereto, except in case of peril or necessity."

The case last cited was one to recover for trespasses against a person who wheeled bathing boxes over land above high-water mark down to the seashore and over

the foreshore, which was leased to the plaintiff, and it was held in that case that the lessee of the foreshore had a right to treat every bather, every nurse-maid with a perambulator, every boy riding a donkey, and every preacher as a trespasser. (See "The Public and the Foreshore," The Law Times, London, volume 139, page 381, September 4, 1915.)

In this country the right of the public to use the foreshore when not granted in fee is much more liberal, as will be seen by the decision in *Barnes* v. *Midland R. R. Ter. Co.* (*supra*).

In *Lansing* v. *Smith* (4 Wend. 9) the court, in construing the constitutionality of an act authorizing the construction of the Albany basin, and also considering the rights of the people in the lands there under water which formerly belonged to the English sovereign, speaking by the chancellor say:

"The people of this state, as the successors of its former sovereign, are entitled to all the rights which formerly belonged to the king by his prerogative. Through the medium of their legislature they may exercise all the powers which previous to the revolution could have been exercised either by the king alone, or by him in conjunction with his parliament; subject only to those restrictions which have been imposed by the Constitution of this state or of the United States. * * * But there can be no doubt of the right of parliament in England or the legislature of this state, to make such grants, when they do not interfere with vested rights of particular individuals. The right to navigate the public waters of the state and to fish therein, and the right to use the public highways, are all *public* rights belonging to the people at large. They are not the *private* unalienable rights of each individual. Hence the legislature as the representative of the public may restrict and regulate the exercise of those rights in such manner as may be deemed most beneficial to the public at large; provided they do not

interfere with vested rights which have been granted to individuals." (p. 21.)

In *People* v. *N. Y. & S. I. F. Co.* (68 N. Y. 71, 77, 78) the court say: "The title to lands under tide waters in this country which before the revolution was vested in the king, became, upon the separation of the colonies, vested in the States within which they were situated. The people of the state in their right of sovereignty succeeded to the royal title and through the legislature may exercise the same powers, which, previous to the revolution, could have been exercised by the king alone, or by him in conjunction with parliament; * * * The State, in place of the crown, holds the title as trustee of a public trust, but the legislature may, as the representative of the people, grant the soil, or confer an exclusive privilege in tide waters, or authorize a use inconsistent with the public right, subject to the paramount control of Congress, through laws passed, in pursuance of the power to regulate commerce, given by the Federal Constitution."

In *Abbott* v. *Curran* (98 N. Y. 665, 668), which was a proceeding to compel a purchaser on foreclosure sale to complete his purchase, it was objected to the title that the lands had been originally under water and that the grant from the state was for commercial purposes only and for the benefit of commerce. It appeared that the lands in question had been entirely severed by streets from the water front. It was held that the "Language in the grant did not impose either a condition precedent or subsequent, or *any restriction upon the absolute title.*"

In *Towle* v. *Remsen* (70 N. Y. 303, 308) the court say: "The land under water originally belonged to the crown of Great Britain, and passed by the Revolution to the state of New York. The portion between high and low water mark, known as the tideway, was granted to the city by the early charters (Dongan Charter, §§ 3 and 14; Montgomerie Charter, § 37) and the corporation have an absolute fee in the same. (*Nott* v. *Thayer*, 2 Bosw. 61.)

It necessarily follows that the city had a perfect right * * * to make the grant of their portion of the land in fee simple absolute."

In *Knickerbocker Ice Co.* v. *Shultz* (116 N. Y. 382, 387) the court say: "Through the medium of the legislature, the state may exercise all the powers which previous to the Revolution could have been exercised either by the King alone or by him in conjunction with his parliament, subject only to those restrictions which have been imposed by the Constitution of this state or of the United States."

In *People* v. *D. & H. Co.* (213 N. Y. 194, 199) the court say: "The title to the bed of navigable streams and the control of navigable waters are vested in the state, subject to the limitations found in the Federal Constitution. (*Langdon* v. *Mayor, etc., of N. Y.*, 93 N. Y. 129.) The state, except for such limitations, has power to grant the title to lands under water, unconditionally or conditionally, or it may grant special rights therein, or it may restrict the boundaries of navigable waters by defining the same."

In *Matter of Long Sault Development Co.* (212 N. Y. 1, 8) the court say: "The power of the legislature to grant land under navigable waters to private persons or corporations for beneficial enjoyment has been exercised too long and has been affirmed by this court too often to be open to serious question at this late day. (Citing authorities.) The contemplated use, however, must be reasonable and one which can fairly be said to be for the public benefit or not injurious to the public. 'For every purpose which may be useful, convenient or necessary to the public, the state has the unquestionable right to make grants in fee or conditionally for the beneficial use of the grantee, or to promote commerce according to their terms. The extensive grant to the city of New York of the lands under water below the shore line around Manhattan Island clearly comes within this principle, since

it was a grant to a municipality, constituting a political division of the state, for the promotion of the commercial prosperity of the city, and, consequently, of the people of the state. So, also, grants to railroads for rights of way and other facilities for the transaction of their business, made under the authority of the state, have been held valid upon the same principle, as well as to corporations and private persons engaged in commerce or navigation for their necessary or reasonable use. Grants to the owners of the adjoining uplands, either for beneficial enjoyment or for commercial purposes, have long been authorized and recognized as one of the uses to which the state may lawfully apply such lands.'"

There are many other decisions of our courts to the same effect but a reference to more of them would unduly extend this opinion. The *Illinois Central R. R. Co.* v. *Illinois* (146 U. S. 387) case and the *Coxe* v. *State of N. Y.* (144 N. Y. 396) case do not hold that the state cannot grant lands under water in fee for the purposes of commerce and beneficial enjoyment. The rule in the *Illinois* case, as stated by this court in *Saunders* v. *N. Y. C. & H. R. R. R. Co.* (144 N. Y. 75, 85), is, "That the ownership, dominion and sovereignty over lands covered by tide waters, within the limits of the several states, belong to the respective states within which they are found, with the consequent right to use or dispose of any portion thereof, when that can be done without substantial impairment of the public interests, and subject to the paramount right of Congress to control their navigation so far as necessary for the regulation of commerce with foreign nations and among the states, and that the same rule was applicable to land under the waters of the great lakes."

Whatever we may think of the wisdom of making the Huber grant, the propriety or validity of the grant is not attacked in this action. Although the action is brought in the name of the People it is not brought to review the

action of the commissioners of the land office nor to set aside or amend the grant. It is, as stated, an action for an injunction.

Even prior to the time when the commissioners of the land office were expressly authorized to grant lands under water for beneficial enjoyment a patent for lands under water could not be invalidated in a collateral action by proof that it was granted for other purposes than to promote the commerce of this state, as that it was granted to a turnpike corporation. (*People* v. *Mauran,* 5 Denio, 389.) The validity of a patent can only be assailed in a direct proceeding to review the action of the commissioners or by an action in equity to set aside the patent. (*Blakeslee Mfg. Co.* v. *Blakeslee Sons Iron Works,* 129 N. Y. 155, 160; *N. Y. C. & H. R. R. R. Co.* v. *Aldridge,* 135 N. Y. 83, 92.)

Every construction upon, or other occupation of land formerly below high-water mark either for commerce or other purpose necessarily interferes in some degree with the public right of passage on the shore and in the sea. Such slight interference is inevitable if the public interests are to be conserved.

During all our history the legislature and the courts have recognized that the public interest may require or at least justify a limited restriction of the boundaries of navigable waters. The public interest may require the building of docks and piers to facilitate approach to the channel of such navigable waters. The beneficial enjoyment of land adjoining the channel of public waters may require or at least justify the conveyance of lands below high water on which to erect buildings. As in England the crown and Parliament can without limitation convey land under public waters, so in this state land under water below high-water mark can be conveyed by the legislature, or in accordance with constitutional and legislative direction. Where the state has conveyed lands without restriction intending to grant a fee therein

for beneficial enjoyment, the title of the grantee except as against the rights of riparian or littoral owners, is absolute, and unless the grant is attacked for some reason recognized as a ground for attack by the courts or the use thereof is prevented by the Federal government, there is no authority for an injunction against its legitimate use.

The appellants have raised many questions relating to the findings of fact and to the sufficiency of the evidence to sustain such findings. The unanimous affirmance of such findings of fact prevents our examination of the record to determine whether there is any evidence or sufficient evidence to sustain them. Other questions have been raised with reference to the sufficiency of the findings to sustain the judgment. Except as indicated by this opinion we are of the opinion that the findings are sufficient to justify the judgment and it is unnecessary to consider the findings for the purpose of showing their sufficiency to sustain the conclusions of law, so far as they are approved.

The judgment, so far as it affects the lands granted to Mrs. Huber in 1897, is reversed, and complaint dismissed, and except as to said lands granted to Mrs. Huber the judgment is affirmed. Costs are allowed to the defendant Huber in this court and in the Appellate Division payable by the respondent.

WILLARD BARTLETT, Ch. J. (concurring in result). Although the validity of the Huber grant is not expressly assailed by the complaint in this action, its validity is at issue by reason of the fact that it is set up in the answer as justifying the occupation of the premises in question. The trial judge did not hold that the grant was void but construed it as subject to the public right of passage along the foreshore. The Appellate Division, however, has declared that it "was clearly beyond the power of the commissioners of the land office to convey an unqualified

fee of such foreshore for private purposes;" and cites in support of this proposition *Matter of Long Sault Development Co.* (212 N. Y. 1) and *Coxe* v. *State of N. Y.* (144 N. Y. 396, 405, 407).

The *Long Sault* case is only remotely applicable, as it involved no question as to rights in the foreshore. The *Coxe* case, however, is strictly pertinent. This court there said: "The title of the state to the seacoast and the shores of tidal rivers is different from the fee simple which an individual holds to an estate in lands. It is not a proprietary, but a sovereign right, and it has been frequently said that a trust is engrafted upon this title for the benefit of the public of which the state is powerless to divest itself." Nevertheless, Judge O'BRIEN proceeded to say in the same opinion: "Grants to the owners of the adjoining uplands, either for beneficial enjoyment or for commercial purposes, have long been authorized and recognized as one of the uses to which the state may lawfully apply such lands"—but not for mere speculative purposes.

The Huber grant is unqualified in form. I think it conveyed an exclusive right to the possession of the premises therein described, if the commissioners of the land office possessed the power to make a grant of this character.

The Public Lands Law assumes to confer such power upon them in express terms. (Pub. Lands Law, § 75.) They are a constitutional body, with such powers and duties as now are or hereafter may be prescribed by law. (Const. art. V, §§ 5, 6.)

The cases in which it has been held that the public right to pass along the foreshore was not destroyed by the grant have been cases in which the right was reserved expressly or by necessary or fair implication, oftentimes arising out of the surrounding circumstances. There is no such feature here. There is no substantial interference with navigation. Access to the foreshore

31

or land between high and low-water mark is obstructed to some extent, but when the state parts with the title to the foreshore it parts with the right to control its occupation. If the grant of lands under water for beneficial enjoyment (or, in other words, in fee simple) was so vast in extent as to amount practically to an alienation of the state's governmental functions along the ocean shore of Long Island, it would, I think, be invalid under the doctrine of *Illinois Central Rwy. Co.* v. *Illinois* (146 U. S. 387), where the grant exceeded 1,000 acres, embracing the whole outer harbor of Chicago. For example, I should not be willing to construe the statute as authorizing the commissioners of the land office to shut off the public from the entire south shore of Long Island by granting the strand to the upland owners for beneficial enjoyment as a series of amusement parks. But the exclusive grant of a few hundred feet, for enjoyment in a manner which does not interfere with navigation, appears to be sanctioned by the letter and spirit of the law, whatever we may think of the wisdom of exercising the power. The question, it seems to me, is largely one of degree. An interesting feature developed by a studious examination of the numerous cases involving grants of land under navigable waters is the extent to which great cities have been built up under such grants. In *United States* v. *Mission Rock Co.* (189 U. S. 391, 406) it was said: "A large and valuable part of the city of San Francisco, extending from the present water front to, in some places, Montgomery street, was at the time of and subsequent to the admission of California into the Union a part of the submerged lands of the bay, but has since been filled in by many hundred grantors under the city and state, who have erected buildings and improvements thereon at costs running into many millions of dollars. All of this was done in aid of commerce, in the upbuilding of a great city upon the bay, and with the encouragement and consent of the general government."

The water front of the city of New York has been similarly developed by extending it over submerged lands for the promotion of the commercial prosperity of the port. (*Coxe* v. *State of N. Y., supra.*)

While the immediate purpose of the Huber grant appears to have been to promote, not commerce, but recreation for private gain, it can hardly be asserted that such a use of shore property to a limited extent is detrimental to the public interest in any such sense as to affect the validity of the grant.

For these reasons I concur in the conclusion reached by Judge Chase, that the judgment should be reversed so far as it affects the defendant Huber.

Hiscock and Collin, JJ., concur with Chase, J., and Willard Bartlett, Ch. J.; Hogan, Cardozo and Seabury, JJ., dissent from the modification of the judgment on the ground that there should be read into the Huber patent an implied reservation of public rights.

Judgment accordingly.