2000 ME 138

**WATERVILLE INDUSTRIES, INC.**

v.

**FINANCE AUTHORITY OF MAINE.**

Supreme Judicial Court of Maine.

Argued Dec. 8, 1999.
Decided July 14, 2000.
As Amended on Reconsideration
in Part Sept. 27, 2000.

Jotham D. Pierce Jr., Esq., (orally), Pierce Atwood, Portland, for plaintiff.

Martha C. Gaythwaite, Esq., (orally), Friedman Babcock & Gaythwaite, Portland, Elizabeth L. Bordowitz, Esq., Finance Authority of Maine, Augusta, for defendant.

Panel: CLIFFORD, and RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

CLIFFORD, J.

[¶ 1] The Finance Authority of Maine (FAME) appeals from a judgment entered in the Superior Court (Kennebec County, *Marden, J.*)[1] in favor of Waterville Industries, Inc. The judgment reflects a jury's determination that FAME breached the purchase and sale contract it had with Waterville Industries for the purchase of a mill in Waterville, and it subjects FAME to pay $150,000 in damages as well as further damages to be determined in the future. FAME contends (1) that the contract merged into the deed conveying the mill, barring claims for breach of the contract; (2) that the action is barred by claim preclusion; (3) that Waterville is prevented from pursuing this state law remedy because it elected to pursue a federal action to judgment; (4) that the claim is barred by sovereign immunity; (5) that the case was unripe for adjudication at the time of trial; (6) that there were serious evidentiary errors at trial; and (7) that the trial court applied the wrong measure of damages. Because we agree that the trial court improperly excluded material evidence on a critical issue in the case, we vacate the judgment and remand to the Superior Court.

[¶ 2] In 1971, First Hartford Corporation built a wool processing mill in Waterville, Maine. Adjacent to the mill were two large wastewater lagoons. After building the facility, First Hartford transferred title to the mill and the twenty-three acres of land on which it sat to a local development company, the Waterville Textile Development Corporation (WTDC). WTDC then leased the property back to First Hartford.

[¶ 3] In 1972, the Maine Guarantee Authority (MGA), FAME's predecessor, guaranteed a mortgage loan from the Society for Savings to WTDC.[2] The loan was secured by the mill, and both WTDC and First Hartford were responsible for the loan payments.

[¶ 4] On March 14, 1980, WTDC and First Hartford defaulted on their loan obligations and MGA took a deed in lieu of foreclosure on the mill.[3] MGA leased the property back to First Hartford, and First Hartford continued to operate the mill.

[¶ 5] Soon after signing the lease agreement, First Hartford filed for Chapter 11 protection in the United States Bankruptcy Court, District of Maine, and it ceased operations at the mill on October 6, 1981. Subsequently, MGA decided to offer the property for sale at public auction.

· [¶ 6] Prior to conducting the auction, MGA received three letters from the Attorney General's office relating to the Department of Environmental Protection's (DEP) rules regarding closure of the wastewater lagoons. The first letter, dated February 2, 1983, informed MGA that "DEP rules require that lagoons which are no longer used be closed out, in accordance

---

1. Though *Marden, J.* ultimately entered judgment in the case, *Bradford, J.* presided at the trial.

2. FAME is a "body corporate and politic and a public instrumentality of the State." *See* 10 M.R.S.A. § 964 (1997). One of its many roles is to stimulate private investment in industrial enterprises that will "provide enlarged opportunities for gainful employment to the people

of the State." *See* 10 M.R.S.A. § 962 (1997). When FAME acts pursuant to its statutory powers, it performs "essential government functions." *See* 10 M.R.S.A. § 964 (1997).

3. MGA claims that, pursuant to its guarantee agreement, it paid several million dollars to satisfy First Hartford's loan obligation.

with technical closure requirements set forth in the rules. Closure of the lagoons is long overdue." That letter also informed MGA that it was required to remove several drums of hazardous waste stored on the property.[4]

[¶ 7] The second letter, dated April 14, 1983, reminded MGA that closure of their lagoons was overdue and that all extensions had expired. The letter also responded to a request by MGA to estimate the cost of closure: "The staff [at the DEP], stressing that it was very hard for them to estimate those costs, suggested the figure of $15,000."

[¶ 8] The final letter, dated July 7, 1983, reiterated that closure was "long overdue" but added that "the Department understands that the lagoons are potentially an asset in the sale of the facility and so [the Department] will not press for immediate closure at this time." The DEP did request, however, that MGA either close the lagoons itself or require closure as a condition of sale.[5]

[¶ 9] The public auction was held in August of 1983. After receiving bids and conducting further negotiations, MGA accepted a cash bid of $655,000 from MKY Realty. The purchase and sale agreement, drafted by MKY, provided:

> 2. *Real Estate Subject to:* The real estate will be conveyed subject to any and all laws, rules, ordinances, regulations, and orders of all state, federal and municipal bodies and that Seller has received no notices of violations of any such laws, rules, regulations, or ordinances.
>
> 3. *Building "AS IS" AND ABSENCE OF WARRANTIES.* BUYER AGREES THAT [IT] IS PURCHASING SAID REAL ESTATE "AS IS" AND "WHERE IS". EXCEPT AS SELLER OR ITS AGENTS HAVE OTHERWISE EXPRESSLY STATED IN WRITING.

The agreement did not explicitly state that it would bind the parties after the closing. MGA did not insist that MKY include a provision in the agreement requiring MKY to close the lagoons as a condition of sale. In fact, MGA never raised the issue of the lagoons and did not inform MKY of the letters it had received from the Attorney General's office.

[¶ 10] The purchase and sale agreement was signed by MGA and MKY on September 20, 1983. · Pursuant to legislation, FAME succeeded MGA on September 23, 1983. *See* P.L.1983, ch. 519, § 6 (effective Sept. 23, 1983). MKY assigned its rights under the contract to GANO Associates at some point after September 20, 1983. Therefore, when FAME conveyed the property on November 15, 1983, the named grantee was GANO Associates. Sometime later, Waterville Industries succeeded GANO Associates.[6]

[¶ 11] Waterville did not use the wastewater lagoons, nor did any of the tenants of the mill building. In 1987, the United States Environmental Protection Agency (EPA) filed an administrative compliance order and assessment of penalties against Waterville for failure to comply with EPA regulations contained in 40 C.F.R. pt. 265 and Me. Dep't of Env. Protection Reg. 855 (Mar. 23, 1983) (regarding licensing and closure of hazardous waste facilities).[7] In 1989, Waterville and the EPA entered into a consent agreement requiring Waterville

---

4. Apparently, MGA removed the drums prior to conveying the property.

5. All three letters referred to violations of Chapter 550 of the DEP's regulations that "define[s] the term wastewater treatment lagoon and outline[s] the procedures by which this type of lagoon may be discontinued either temporarily or permanently." *See* Me. Dep't of Env. Protection Reg. 550 (Feb. 8, 1978).

6. Waterville Industries, Inc. is a Rhode Island corporation.

7. The EPA did not ground any portion of its action on violations of Me. Dep't of Env. Protection Reg. 550 (Feb. 8, 1978), which had been the subject of the letters from the Attorney General.

to clean up the property and pay a civil penalty. At the time the case was tried, Waterville had incurred substantial costs by hiring engineers and consultants to develop a compliance plan.

[¶ 12] On July 7, 1989, Waterville filed the complaint in this case, for declaratory relief and damages against FAME in the Superior Court, seeking damages for breach of the purchase and sale agreement. On September 6, 1989, Waterville filed a complaint seeking declaratory relief and damages, also against FAME, in the United States District Court, District of Maine. That complaint contained two counts. In Count I, Waterville claimed that FAME was liable for the cleanup costs as a "responsible party" pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). See 42 U.S.C.A. § 9607(a)(1) (1995). Count II also relied on CERCLA and sought contribution from FAME as a former owner of the property. See 42 U.S.C.A. § 9613(f) (1995).

[¶ 13] Although Waterville was successful in the United States District Court, judgment in its favor having been entered after a trial, the First Circuit Court of Appeals· reversed the judgment following FAME's appeal. See Waterville Indus., Inc. v. Finance Auth. of Me., 984 F.2d 549 (1st Cir.1993). The First Circuit held that FAME had never been an "owner" of the property for CERCLA purposes because CERCLA excepted from liability owners who acquired title for the sole purpose of protecting their security interest in the property. See id. at 554; see also 42 U.S.C.A. § 9601(20)(A) (1995). Accordingly, FAME was not liable pursuant to CERCLA. See Waterville Indus. v. Finance Auth. of Me., 984 F.2d at 554.

[¶ 14] Having been unsuccessful in its claims in federal court, Waterville pursued its state law claims in the Superior Court. FAME filed a motion for summary judgment claiming that the state law action was barred by principles of res judicata.

The motion was denied, and the case was tried before a jury in November of 1993.

[¶ 15] The jury returned a verdict in favor of Waterville, finding damages to be $150,000 as of the time of the verdict. This represented the amount Waterville had spent before trial in complying with the consent decree. After a delay of several years, judgment in this case was finally entered on April 16, 1998. After its post-trial motions were denied by the trial court, FAME filed this appeal.

## I. MERGER

■■■ [¶ 16] As an initial matter, FAME contends that the doctrine of merger bars any claims arising pursuant to the purchase and sale agreement. We disagree. Collateral agreements in a purchase and sale contract do not merge into the deed. See Wimmer v. Down East Properties, Inc., 406 A.2d 88, 91 (Me.1979) (holding that an agreement to construct a house was collateral to an agreement to convey land). An agreement is collateral if it is not "connected with the title, possession, quantity, or emblements of the land." See Caparrelli v. Rolling Greens, Inc., 39 N.J. 585, 190 A.2d 369, 372 (1963). In this case, the agreement to provide information as to notices of violations of rules and regulations was wholly separate from the issues of "title, possession, quantity, or emblements" of the property. Accordingly, that agreement did not merge with the deed.

## II. CLAIM PRECLUSION

[¶ 17] FAME further contends that because Waterville's state law action arises out of the same transaction that formed the basis for Waterville's federal court action, which ultimately resulted in a judgment in favor of FAME, the state law action is barred by the principles of claim preclusion and the doctrine of election of remedies. FAME also maintains that Waterville impermissibly split its cause of ac-

tion. We are unpersuaded by those contentions.

[¶ 18] "The effect of [a] prior decision upon the present action is a question of law." *Currier v. Cyr*, 570 A.2d 1205, 1207–08 (Me.1990). Principles of claim preclusion bar relitigation of claims where (1) the same parties are involved in both actions; (2) the prior action ended with a valid final judgment; and (3) "the matters present for decision now were, *or might have been*, litigated in the prior action." *See id.* at 1208 (emphasis added); *see also Camps Newfound/Owatonna Corp. v. Town of Harrison*, 1998 ME 20, ¶ 11, 705 A.2d 1109, 1113. Although Waterville's state law claims normally would be barred because they arise from " 'the same aggregate of operative facts' " as the federal claims tried previously, *see Camps Newfound/Owatonna Corp. v. Town of Harrison*, 1998 ME 20, ¶ 11, 705 A.2d at 1113 (quoting *Connecticut Nat'l Bank v. Kendall*, 617 A.2d 544, 547 (Me.1992)), they are not barred in the circumstances of this case.

[¶ 19] Jurisdiction in CERCLA cases is vested exclusively in the federal courts. *See* 42 U.S.C.A. § 9613(b) (1995) ("[T]he United States district courts shall have exclusive original jurisdiction over all controversies arising under this chapter.").

Accordingly, Waterville's only forum for its CERCLA claims was the federal district court.[8] *See id.* That court, however, had no jurisdiction over Waterville's state law breach of contract claim because the Eleventh Amendment prohibits federal courts from entertaining suits "commenced or prosecuted against one of the United States by Citizens of another State." *See* U.S. Const. amend. XI.[9] Given the jurisdictional dilemma faced by Waterville, the Superior Court did not err in entertaining Waterville's claims in this state court action because those claims could not have been litigated in the federal action. *See Camps Newfound/Owatonna Corp. v. Town of Harrison*, 1998 ME 20, ¶ 11, 705 A.2d at 1113; RESTATEMENT (SECOND) OF JUDGMENTS § 25 cmt. e (1980) (stating that where "the court in the first action would clearly not have had jurisdiction to entertain the omitted theory or ground . . . then a second action in a competent court presenting the omitted theory or ground should be held not precluded"); *cf. First Interstate Bank v. Central Bank & Trust Co.*, 937 P.2d 855, 858 (Colo.Ct.App.1996) (holding that res judicata does not apply if it is clear that the federal court in first action would have declined to exercise pendent jurisdiction on the claims brought in the second action).[10]

---

8. Waterville was only permitted to bring its CERCLA claims against FAME in federal court because Congress had expressly authorized such suits. *See Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 23, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989). Under current law, however, even Waterville's CERCLA claims would be barred from federal court. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 72, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (overruling *Pennsylvania v. Union Gas Co.*on the ground that the commerce clause does not give Congress the power to authorize CERCLA suits against unconsenting states).

9. While the State may consent to suits against FAME in federal court, neither party suggests that the State has given that consent. *See Port Auth. Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 306, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990) (" '[I]n order for a state statute . . . to constitute a waiver of Eleventh Amendment

immunity, it must specify the State's intention to subject itself to suit in *federal court.*' ") (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)).

10. FAME's argument that Waterville impermissibly split its cause of action fails for the same reason. Though principles of "[r]es judicata prevent[ ] a litigant from splitting the litigant's claim" where "the litigant had a reasonable opportunity to argue [the claim] in the prior action," *see Camps Newfound/Owatonna v. Town of Harrison*, 1998 ME 20, ¶ 12, 705 A.2d at 1113–14, Waterville did not have a "reasonable opportunity" to pursue recovery for breach of contract in federal court, *see* RESTATEMENT (SECOND) OF JUDGMENTS § 26(1)(c) (1980) (plaintiff may split cause of action where court in first action had limited subject matter jurisdiction).

[¶ 20] FAME also argues that this action brought by Waterville is barred by the doctrine of election of remedies because Waterville chose to pursue its CERCLA remedies in the federal court. The doctrine of election of remedies rests on the notion that a party should not be able to rely " 'upon two *contradictory* principles or theories based upon one and the same set of facts.' " *See Carey v. Cyr,* 150 Me. 405, 113 A.2d 614, 616 (1955) (holding that a plaintiff who asserted a lien on property in one action could not proceed in a subsequent action on a theory that he owned the property) (quoting *Davis v. Hauschild,* 243 S.W.2d 956, 959 (Mo. 1951)). That doctrine does not apply to cases like this one where the plaintiff mistakenly believes it has two remedies but, in reality, has only one. *See Marsh Bros. & Co., Ltd., v. Bellefleur,* 108 Me. 354, 357, 81 A. 79, 80 (1911) ("[T]he mistaken selection of a remedy that never existed and its fruitless prosecution until it is adjudged inapplicable, does not prevent the exercise of another, if appropriate, even if inconsistent with that first adopted."); *see also Clark v. Heath,* 101 Me. 530, 532, 64 A. 913, 913–14 (1906). As the First Circuit's opinion makes clear, Waterville never had any remedy against FAME pursuant to CERCLA. *See Waterville Indus. v. Finance Auth. of Me.,* 984 F.2d 549, 554 (1st Cir.1993). Accordingly, Waterville's claim is not barred by the doctrine of election of remedies.

### III. SOVEREIGN IMMUNITY

[¶ 21] FAME also contends that Waterville's claim against FAME is barred because of sovereign immunity. A claim against the State will be dismissed "unless the State, acting through the Legislature, has given its consent that the present action be brought against it." *See Drake v. Smith,* 390 A.2d 541, 543–44 (Me.1978). On September 20, 1983 when the parties entered into the contract, the Legislature

had given its consent to suits against the MGA for breach of contract. At that time, the enabling law for MGA provided that MGA could "[s]ue and be sued in its own name ... and plead and be impleaded." *See* 10 M.R.S.A. § 1005(4) (Supp.1983), *repealed by* P.L.1983, ch. 519, § 6 (effective Sep. 23, 1983).[11] That provision clearly subjected the MGA to suits for breach of contract. FAME's contention that later amendments to the statute have limited the scope of FAME's liability to suit is unavailing as "[i]t is well settled that the law in effect at the time of the execution of a contract becomes part of that contract." *See Portland Sav. Bank v. Landry,* 372 A.2d 573, 575 (Me.1977), *quoted in Clark v. Rust Eng'g Co.,* 595 A.2d 416, 419 (Me. 1991).

### IV. DECLARATORY RELIEF

[¶ 22] FAME argues that the trial court erroneously granted declaratory relief in this case both because the case was not yet ripe for adjudication and because it was not an appropriate case for declaratory relief. Whether a case is ripe for decision is a question of law which we review de novo. *See generally Wagner v. Secretary of State,* 663 A.2d 564, 567 (Me. 1995). "Ripeness concerns the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration." *Id.* A case is fit for judicial decision when there exists a genuine controversy between the parties that presents a "concrete, certain, and immediate legal problem." *See id.*

[¶ 23] Waterville's breach of contract claim is particularly well suited to declaratory relief because it presents a concrete issue of liability for breach of contract and a claim by Waterville that as a result of the breach it is suffering continuing damage as it incurs additional costs

11.  When section 1005(4) was repealed, it was replaced by 10 M.R.S.A. § 969, which contained almost identical language. *See* P.L. 1983, ch. 519, § 6 (effective Sep. 23, 1983).

in its efforts to clean up the property.[12] Moreover, Waterville would suffer severe hardship if the court refused to consider its claim. Waterville filed its complaint in 1989 seeking declaration that a breach had occurred in 1983. If Waterville had been unable to file its claim at that time, the claim would have been barred by the six year statute of limitations. *See* 14 M.R.S.A. § 752 (1980). That hardship outweighs the potential cost of duplicative litigation in this case. *Cf. Patrons Oxford Mut. Ins. Co. v. Garcia*, 1998 ME 38, ¶ 10, 707 A.2d 384, 387 (balancing the possibility of duplicative litigation against the hardship to the plaintiff in delaying relief to determine whether declaratory relief was appropriate). Accordingly, the case was ripe for adjudication.

[¶ 24] We must also determine whether the trial court's granting of declaratory relief is, as FAME contends, beyond its discretion. The trial court's "exercise of discretion in granting or denying [declaratory relief] is accorded deference on appeal." *See Perry v. Hartford Accident and Indem. Co.*, 481 A.2d 133, 135 (Me.1984). The deference accorded, however, "is less than that accorded many other rulings made by a court of first instance, such as findings of historical fact based on testimony or discretionary rulings on the admissibility of evidence." *See id.* at 136.

[¶ 25] We have said that a court, in deciding whether to grant declaratory relief, should construe the declaratory judgment statute liberally " 'to effectuate its salutary purpose.' " *See id.* (quoting *King Resources Co. v. Environmental Improvement Comm'n*, 270 A.2d 863, 867 (Me.1970)). A court, however, "should exercise its authority to issue such a declaration only when some useful purpose will be served." *Dodge v. Town of Norridgewock*, 577 A.2d 346, 347 (Me.1990). Although we

vacate the judgment on evidentiary grounds, the use of a declaratory judgment in this case was appropriate because it purported to determine both liability for breach of contract and the scope of damages resulting from that breach.

## V. EXCLUDED EVIDENCE AND MEASURE OF DAMAGES

[¶ 26] FAME contends that the court erred when it refused to allow FAME to present evidence that MKY would have chosen to purchase the mill even if it had known about the letters from the Attorney General that were not disclosed at the time of the sale. We agree.

[¶ 27] We review evidentiary rulings for clear error and an abuse of discretion, *see Kay v. Hanover Ins. Co.*, 677 A.2d 556, 558 (Me.1996), and we will only vacate a judgment if the evidence excluded " 'was relevant and material to a critical issue and if it can with reason be said that such evidence, if admitted, would probably have affected the result or had a controlling influence on a material aspect of the case.' " *See Minott v. F.W. Cunningham & Sons*, 413 A.2d 1325, 1329 (Me.1980) (quoting *Towle v. Aube*, 310 A.2d 259, 264 (1973)); *see also Todd v. Andalkar*, 1997 ME 59, ¶ 7, 691 A.2d 1215, 1218.

[¶ 28] The real issue in this case appears to be whether the failure of FAME's predecessor, the MGA, to notify MKY of the letters from the Attorney General was a sufficiently material breach of the contract that would allow Waterville to recover any damages as a result of the breach. As a way of determining that materiality, the trial court instructed the jury as follows:

> If you find that Waterville Industries' predecessor, MKY Realty, would not have purchased the property if not for a breach of contract on the part of the Maine Guaranty Authority or FAME,

---

12. The court also envisioned that Waterville would, at some point after final judgment, apply for supplemental relief, relief that is explicitly authorized by the Declaratory Judg-

ments Act. *See* 14 M.R.S.A. § 5960 (1980) ("Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper.").

then you should award all damages which have arisen to date because the property was purchased.

That instruction served as a kind of proxy for the issue of materiality. It essentially allowed the jury to determine materiality by focusing on MKY's intent at the time it purchased the property. If MKY would not have bought the property had it known of the contents of the letters from the Attorney General, the breach was material. If MKY would have purchased regardless of the knowledge, the breach was not material. Waterville presented evidence that the purchase price for the property was $655,000, and it also offered testimony from Mr. Salvadore, MKY's president, that MKY would not have bid on the property had it known of the letters from the Attorney General.

[¶ 29] To rebut that testimony, FAME offered the following evidence: (1) the asking price for the property prior to the auction; (2) the amount of money FAME lost on the sale; (3) Waterville's income from the property in the years following the purchase; and (4) a statement by Mr. Salvadore regarding the tax assessment of the property at the time of sale and his statement that the property was worth substantially more than $655,000. The court excluded the evidence.

[¶ 30] FAME contends that the purchase price for the Waterville mill was substantially less than its true value, and that the nondisclosure was not material because MKY would have purchased the property even if it had been made aware of the Attorney General's letters. Because the parties agreed that MKY's intent was crucial to this issue, the court erred in limiting FAME's cross-examination of Mr. Salvadore on the issue of whether MKY would have purchased the property with knowledge of the letters, see *Pendleton v. Sard,* 297 A.2d 889, 891 (Me.1972) (holding that "deprivation of the right of cross-examination on a material issue constituted prejudicial error"), and in excluding other relevant evidence regarding the value of the property at the time it was sold. Because FAME was deprived of introducing evidence on an issue critical to the case, we vacate the judgment and remand for a new trial.

[¶ 31] We need not address the extent to which there is merit to FAME'S argument that the trial court applied the wrong measure of damages, allowing Waterville to recover the *entire* cost of cleanup if the jury found that MKY would not have purchased the property had it known of the letters from the Attorney General. It is sufficient to say that on remand. Waterville should be required to establish not only that the failure to disclose the letters from the Attorney General was a material breach of the purchase and sale agreement by MGA, but also that the damages it is seeking to recover would naturally flow from this breach of the contract, or were reasonably within the contemplation of the contracting parties when the agreement was made.[13] *See Thoms v. Dingley,* 70 Me. 100, 102-04 (Me. 1879).

The entry is:

Judgment vacated. Case remanded for further proceedings consistent with this opinion.

---

13. Waterville need not relitigate the issue of whether MKY assigned its rights under the contract to Gano Associates, as that issue was decided by the jury at trial and has not been challenged.