**UNITED STATES of America,**
Appellee,

v.

**Howard B. CHATHAM and His Wife,**
**Mrs. Howard B. Chatham,**
Appellants.

No. 8936.

United States Court of Appeals
Fourth Circuit.

Argued June 11, 1963.

Decided Sept. 23, 1963.

Herbert L. Hyde, Asheville, N. C., for appellants.

A. Donald Mileur, Atty., Dept. of Justice (Ramsey Clark, Asst. Atty. Gen., William Medford, U. S. Atty., and Roger P. Marquis, Atty., Dept. of Justice, on brief), for appellee.

Before SOBELOFF, Chief *Judge, and* HAYNSWORTH and J. SPENCER BELL, Circuit Judges.

HAYNSWORTH, Circuit Judge.

The United States acquired no interest in land which it sought to condemn when it gave no notice of the proceeding to the owners and did not physically seize the land.

The United States brought this action (1) to quiet its title to certain mountainous lands, (2) for an injunction prohibiting further trespasses by the defendants upon the land, and (3) for damages equivalent to the value of standing timber which the defendants had caused to be removed. Originally, the District Court granted the Government's motion for summary judgment upon the theory of a supposed estoppel running against a predecessor in title of the defendants. On appeal, we found no estoppel and remanded the case for further proceedings on the merits.[1]

At the hearing on the merits, after remand, the United States raised no question affecting the validity of the title of the defendants' predecessors immediately preceding a condemnation proceeding commenced in 1935 and concluded in 1936. Nevertheless, it contended it acquired title, good against the world, in the condemnation proceeding, though it proceeded against parties who were complete strangers to the land and took no steps calculated to inform the true owners of the proceedings. The District Court accepted the Government's contention and granted the requested relief including the entry of a money judgment in an amount fixed by an advisory jury. Under the circumstances to be disclosed, we think the District Court fell into error.

The defendants' title stems from one W. P. Head. In 1905, Head acquired by deed two adjoining tracts of land in Macon County, North Carolina. The southernmost of the two, said to contain 128½ acres, was a natural mountain

1. United States v. Chatham, 4 Cir., 298 F.2d 499.

cove. Except as noted below, its boundaries run along natural ridges, coinciding in part with the boundary between Macon and Cherokee Counties. The highest elevations are along the boundaries of the southern portion of the tracts. The northerly extending bounding ridges fall off, however, and the north portion of the tract is unbounded by ridges. In addition, what is now Forest Service Tract No. 505 juts into the southeast part of the cove, and no part of that tract was owned or claimed by Head or his successors.

From 1905 until his death in 1928, Head lived on this land. He cultivated it and harvested its timber. His house was on the northernmost of the two tracts but near their common boundary and close by a highway. He cultivated the lower levels of the 128½-acre tract, however, growing corn, potatoes, beans and cabbages. He maintained pastures on that tract for his cattle and work animals. There were a number of apple trees. From time to time he took trees from the higher elevations of that tract and sold telephone poles, crossties, acid wood and tanbark. For a time one of his sons lived in a house on the 128½-acre tract.

After Head's death, his widow and some of his heirs stayed on for a time, deriving their living from the place. They sold a right of way for a power line running across the cultivated portions of the 128½-acre tract. In 1931, however, they leased the place to one Buck Godfrey and moved away, for the widow had grown old and was finding it difficult to run the place.

Buck Godfrey moved into the Head home in 1931. As Head had done before him, he lived on the place, farmed it, pastured his cow and harvested timber. He paid a monthly rental to Mrs. Head

as long as she lived and, thereafter, to one of her sons. The house burned in 1943, however. Godfrey then moved away, and no one has since lived on the land or cultivated it.

Meanwhile, in 1935, the United States brought a proceeding to condemn a number of tracts of land in Cherokee, Jackson and Macon Counties as additions to its Nantahala National Forest. Among them were several tracts of land said to be owned by the Estate of R. Y. McAden.

The McAdens owned several tracts of land in Cherokee County. On Forest Service maps, however, one of the McAden tracts designated Forest Service Tract No. 238–I, was located in Macon County, despite the fact the McAden title to that tract was said to have derived from Grant 3119 of land in Cherokee County. How this came to be is unexplained in the record. A Forest Service surveyor testified that using a Spanish oak, high on the ridge on the boundary between Cherokee and Macon Counties, as a starting point, a projection of the calls of Grant 3119 from there resulted in the location of Forest Service Tract 238–I entirely in Macon County and largely overlapping the lands of Head. He used that Spanish oak as a starting point because records of the Forest Service indicated he should, but he did not known from what those records derived.[2]

Forest Service Tract 238–I, as thus located on Forest Service maps, is a rectangular shaped tract of 80.8 acres, some seventy of which are within the boundaries of the second Head tract of 128½ acres. Until the condemnation proceeding, however, the overlap was only cartographic, for it does not appear that the McAdens, or their predecessors, had ever claimed or possessed any part of

2. That Spanish oak appears to have been a corner of another McAden tract lying largely in Cherokee County but partially in Macon. If used as the starting point for plotting Grant 3119, that tract touches other McAden lands only at that point; there is no common boundary. Perhaps some other Spanish oak in a McAden

boundary should have been used as the starting point for plotting Grant 3119. Perhaps in the grant the calls were reversed. The result of the Forest Service's plotting of Grant 3119, however, was to locate entirely in Macon County lands which the grant declared lie entirely in Cherokee County.

the Head lands, or had ever been associated in any way with those lands.

That was the situation when the United States undertook to condemn Forest Service Tract No. 238–I along with many other tracts. The McAden heirs were named defendants; the Heads and their tenant were not. The Government sought to join all unknown persons claiming any interest in any of the many tracts and to serve those unknown persons by publication. The published notice informed unknown claimants that the United States sought to condemn McAden lands, in the following language:

"No. 4. R. Y. McAden Estate Tracts. All those tracts of land containing according to survey 1007.7 acres, designated by the National Forest Service as Tracts Nos. 238, 238–I, Nantahala and Cherokee Units, Cherokee and Macon Counties, North Carolina, situate, lying and being on the waters of Valley River in Valley township, adjoining the lands of Mrs. Emma Watson, Mrs. Mamie A. Rogers, Andrews Manufacturing Company, J. T. Young, United States National Forest, and others, and more particularly described in an option to convey to the United States, dated May 30, 1934, and in the petition filed herein."

During its most recent term, The Supreme Court of the United States had occasion to restate the constitutional requirement of actual notice in condemnation proceedings which are to be accorded finality. In Schroeder v. City of New York, 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255, the Court had before it an action by a riparian land owner claiming damages because of diversion of water from the river some twenty-five miles upstream. The City of New York had undertaken to acquire by condemnation a right to divert water from the river and had attempted to serve downstream riparian owners by publication. The notice, which did not name the individual land owners, was published in newspapers of limited circulation and on bills posted in a number of places along the river but not on the plaintiff's property. The plaintiff had no actual notice of the condemnation proceeding and did not appear in it. Later, when she learned of the diversion of the water, the concluded condemnation proceeding was urged as a bar to her independent action for damages.

The Court held in Schroeder that the publication of the notice did not comply with the requirements of due process, so that the action for damages was not foreclosed by the condemnation proceedings. In doing so, it repeated statements from earlier cases[3] emphasizing the practical ineffectiveness of notice by publication, particularly when the parties to be served are not named in the notice or live outside the area of circulation of the medium of publication.

That is not to say that service by publication may never be given legal effect. At times, there is no alternative. If it is practically impossible to ascertain all parties who may conceivably claim some interest in the controversy, the processes of the law need not be halted, and the rights of the unknown persons can be adjudicated. But service by publication is not an adequate substitute for actual notice, when giving actual notice to identified parties is neither impossible, impractical, nor unreasonable. When condemnation plaintiffs take the easy course, they should not be heard to say that the proceedings had upon published notice addressed to unknown persons foreclosed the rights of interested parties who were readily identifiable and easily served, particularly when the condemnation plaintiff knew, or should have known, that the unidentified persons had a substantial interest in the litigation.

3  Mullane v. Central Hanover Tr. Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865; City of New York v. New York, N. H. & H. R. Co., 344 U.S. 293, 73 S.Ct. 37, 97 L.Ed. 333; Walker v. City of Hutchinson, 352 U.S. 112, 77 S.Ct. 200, 1 L.Ed.2d 178.

This, of course, is a much more extreme case than Schroeder. There the City's task of identifying every riparian owner who might be adversely affected by a diversion of water could have been huge, but here, identification of the Heads as the true owners of this land would have been simple and easy. They held the record title to the land. From 1928 on, it was listed for taxation in their names. Any passerby on U. S. Highway 19, close by Godfrey's door, would have seen, had he looked, the cleared fields and pastures on the land now claimed by the United States. He would have seen the power line, too. If he stopped and inquired of Godfrey, he would have been told that the Heads owned the land and rented it to Godfrey. Jim Head, one of the sons of W. P. Head, lived at Topton, approximately two miles from the place, and it was to him that Godfrey paid the rent after the death of Mrs. Head. The Heads had lived on the land for more than twenty-five years and numberless persons in the area must have known them and of their interest in the land. Inquiry of the power company would have revealed the source of its right of way.

Though full information was so easily obtainable, apparently the United States made no inquiry in 1935 when it brought the condemnation proceeding. That was outrageously inexcusable, if the Government's intention at the time was to condemn the specific land it now claims. It would be consistent with a much more limited intention to condemn the McAden interest, whatever it might be, in unlocated land covered by Grant 3119, but the Government now disclaims that intention.

Absence of actual notice to the Heads was not the only deficiency in the proceedings. The published notice was wholly deficient if intended as notice that the Head lands were being condemned. If each of the Heads, with a lawyer at his elbow, had read the published notice, they would not have surmised that their lands were involved. The published notice informed the reader that McAden lands were being condemned, and the McAdens had no known connection with the lands of the Heads. The notice located the lands in Valley Township and on the waters of Valley River, while the Head lands are on the waters of the Nantahala, an unrelated watershed to that of the Valley River. The published notice stated that the lands to be condemned were bounded by those of a number of named persons, no one of whom appears to have owned lands adjoining the Heads. In short, if the intention of the United States in 1935 was to condemn the specific land it now claims as Forest Service Tract 238–I, its description in the published notice could hardly have been more inaccurate or misleading. If the intention was what the Government now asserts it was, the published notice was a gross deception.

Plainly, the condemnation proceedings did not afford the Heads due process and did not foreclose their rights.

The Government contends, however, and the District Court held, that the proceedings *in rem* effectively vested in the United States title to the lands, though, because of the want of notice, they may not have foreclosed the right of the Heads to just compensation had that right been thereafter asserted in a timely action.

There are, of course, a number of cases in which procedural defects in condemnation proceedings were held to give rise only to an independent action for just compensation. In Schroeder v. City of New York, 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255, it would have been most inappropriate to require New York to restore the flow of the river and imperil its water supply while bringing to a conclusion a new condemnation proceeding founded upon actual notice to Mrs. Schroeder. There was no question of the City's right to condemn. When, therefore, Mrs. Schroeder was provided a remedy by which she now might receive compensation and participate in a hearing for its determination, she was afforded fully every right she lost because of her lack of notice of the earlier proceedings.

In other situations, where the land has been actually seized by the condemning authority, particularly if it has been improved or devoted to public use, the public interest may be protected without sacrifice of private rights by affording a present remedy for the determination and collection of just compensation.

Here, however, the condemnation court never acquired *in rem* jurisdiction over the land, and its judgment insofar as it purported to affect the land was void.

The land was not seized. For eight years after the proceedings were commenced and for seven years after they were concluded, Godfrey's exclusive possession of the land as the Head's lessee was not in the least disturbed. The contention that *in rem* jurisdiction was acquired must rest exclusively upon the published notice, for there was no other process. The published notice was so deficient in its description of the land that it was not only unenlightening but positively misleading.

■■ When no reader of the notice could have understood that the proceedings were directed to this land, it cannot be an adequate foundation for an exercise of an *in rem* jurisdiction over this land.[4] Publication of a notice of proceedings directed to the lands of Smith in Jones County cannot support a judgment affecting McDuffie's title to his lands in Robertson County. We need not now consider, therefore, whether the Heads might have been limited to a claim for compensation if the only procedural defect had been the absence of actual notice,[5] for the absence of actual notice and the gross misdescription of the land in the published notice, in combination,

vitiated the entire proceedings to the extent they purport to affect the lands of the Heads, their title or possessory rights.

Even if the circumstances were such that only a right to compensation survived the condemnation proceedings, that right should not be held to have accrued until the parties in interest were made aware of it, or aware that the United States claimed exclusive possessory rights in the land: That did not occur until after the Chathams had removed the timber. Since the United States, in those circumstances, would be obligated to pay to the Chathams the fair value of the land, including what timber was on it, a money judgment in favor of the United States against the Chathams for the value of removed timber ought not to stand.[6]

Finally the United States contends it has acquired title to the land by adverse possession. If the condemnation proceedings might be said to have given the Government color of title to the land, its possession was insufficient to validate its title.

As we have seen, the Heads were in exclusive possession of the land from the entry of the condemnation judgment until Godfrey left in 1943. The United States was not then in possession of it. Thereafter the relation of the United States to the land underwent no substantial change. Occasionally, a ranger on his way to timber sales in Cherokee County would travel a logging road which crossed the southwest corner of the tract,[7] but there was testimony that Head had granted rights of way for that road, that it had been used for years by loggers and that the Heads had no right to close

---

4. See Collins v. City of Wichita, Kansas, 10 Cir., 225 F.2d 132; Chattooga County v. Scott, 215 Ga. 68, 108 S.E.2d 876.

5. Cf. United States v. Ivie, N.D.Ga., 163 F.Supp. 138.

6. If the right were held to have accrued when the condemnation judgment was entered in 1936 and to be now barred by

limitations despite the fact the exclusive possession of the Heads was undisturbed at least until 1943, the remedy would be wholly inadequate to rectify the deprivation of their constitutional rights.

7. If the Forest Service then thought it possessed this tract, it is odd that neither these rangers nor anyone else ever questioned the Heads' occupancy of it.

it. A Forest Service map bore a notation of a sale in 1944 of acid wood from this and a number of other tracts, but no one could remember that the purchaser actually cut acid wood from Tract 238–I. Even if he did, this was an isolated occurrence of short duration which would not suggest an exercise of continuous dominion.

There was testimony that old Forest Service boundary marks were found in some places along the boundaries of Tract 238–I. However, most of these were on boundaries common with other tracts unquestionably owned by the United States. If the Heads ever saw them they would suggest no more than that the United States owned the adjacent tract, as it did in fact.[8] One witness said he found some such old marks "near the stream at the lower edge of the tract," but it was not shown that Godfrey or the Heads ever saw them or that they were so located that persons occupying or coming on the land would likely have seen them.

These few boundary marks were not such an open and obvious indication of the Government's present claim as to warn others of it. Had notices been posted about the place, we would have had a different situation, but these equivocal marks, not shown to have been readily apparent in the one place in which they might not have been equivocal, were neither an open nor an obvious assertion of possessory rights.

■■ The adverse possession which in the course of time may validate a claim under color of title must be an actual possession, not a technical one. It must be continuous and open and of a kind, considering the nature of the land and its potential uses, that is calculated to bring home to others viewing the land and coming upon it the existence of the possessor's claim.[9] The possessor, of course, need not be always present but a "possession" which is compatible with the open, exclusive possession of the Heads of the same land over a continuous period of seven years is not the kind of adverse possession which, unchanged after the departure of the Heads, could validate a claim under color of title.

The Heads passed from the picture because Macon County acquired their lands in a tax foreclosure. Many years later it conveyed the lands to the defendants, Chatham. Since we hold that the United States acquired no interest in the land as a result of the condemnation proceeding or its technical possession of the land after 1943, we must conclude that the United States was entitled to no relief respecting its claim to Tract 238–I. There was testimony, however, that some trees were cut by the Chathams' licensee on Tract 505, though the licensee denied that he strayed over the common boundary between the Chatham land and Tract 505. The Chathams were properly required to pay to the United States the value of those trees on the stump, found by the Court to have been $50, for they had received from their licensee the stumpage of those trees.

Judgment in favor of the United States for $50, the value of trees cut from Tract 505, with interest thereon, is affirmed. The judgment, otherwise, is reversed.

Affirmed in part; reversed in part.

8. The Forest Service used red painted blazes as boundary markers. When it marked a boundary, a tree immediately on it would be marked on both sides, while one just off the boundary would be marked on its side nearest the boundary. One seeing such marks, therefore, could tell from them where the boundary was supposed to be, but he could not tell from them whether the United States claimed the land on one side or the other. Many Forest Service boundaries were not marked at all, however, particularly those located by stadia surveys.

9. See United States v. Fullard-Leo, 331 U.S. 256, 67 S.Ct. 1287, 91 L.Ed. 1474.