UNITED STATES of America, Plaintiff,

v.

**1.58 ACRES OF LAND SITUATED IN the CITY OF BOSTON, COUNTY OF SUFFOLK, COMMONWEALTH OF MASSACHUSETTS, et al., Defendants.**

Civ. A. No. 80–2207–G.

United States District Court,
D. Massachusetts.

Aug. 19, 1981.

Kenneth P. Nasif, Asst. U. S. Atty., Boston, Mass., for plaintiffs.

Harold Widett, Widett, Slater & Goldman, Boston, Mass., for Trustees of Constitution Realty Trust & 409 Trust.

Howard Palmer, Asst. Atty. Gen., Boston, Mass., for Commonwealth of Mass.

Alan Hoffman, Lynch, Brewer, Hoffman & Sands, Boston, Mass., for J., R., and James Faro.

## MEMORANDUM OF DECISION

GARRITY, District Judge.

The United States filed a Complaint in Condemnation on October 1, 1980, to take certain waterfront property at 409 and 411–423 Commercial Street in Boston. This property had been selected by the Commandant of the United States Coast Guard for "use in connection with the redevelopment and improvement to Coast Guard Support Center, Boston, and for such other uses as may be authorized by Executive Order." The interest in the property that the government seeks to take is "the fee simple title, subject, however, to existing easements for public roads and highways, public utilities, and pipelines." The United States also filed on October 1, 1980, along with its Complaint and Declaration of Taking, an *ex parte* motion for an Order for Delivery of Possession. The Government's motion was allowed on October 2, 1980.

The only interested party who objected to the terms of the taking was the Commonwealth of Massachusetts. The Commonwealth filed an Answer and Counterclaim on October 28, 1980. Both the Answer and the Counterclaim denied that the United States could obtain a fee simple absolute in such portions of the land described in the Declaration of Taking that lie below the low water mark[1] in Boston Harbor. The Commonwealth contends that such a fee, as modified by the language of the Declaration permitting "such other uses as may be authorized by Congress or by Executive Order" could vitiate the perpetual public trust that is impressed upon land below the low water mark and which is administered by the Commonwealth. The Commonwealth is concerned that the terms of this taking may put the submerged land forever beyond the state's control for purposes of the trust. This would happen if the United States could convey a fee simple absolute title to the submerged land to a private individual, free of the trust administered by the Commonwealth.

The owners of the property at 409 and 411–423 Commercial Street, after reaching an agreement with the United States on the amount of compensation, moved for summary judgment on November 28, 1980. The owners contend, without dispute, that whatever interest the Commonwealth has in the submerged part of the property is noncompensable. The United States then filed its brief in opposition to the answer and counterclaim of the Commonwealth on February 26, 1981, and the Commonwealth responded on April 2, 1981. A hearing was held on April 10, 1981, at which the Commonwealth's objection to the taking was resolved by stipulation. The Commonwealth's objection to the language, "such other uses as may be authorized by Congress or by Executive Order" was resolved by adding the following stipulated language: if the taken property is ever "declared to be excess to the needs of the Federal Government, [it] will be disposed of in accordance with Title 41 C.F.R. § 101047.303.2 entitled 'disposals to public

---

1. The "low water mark" is defined as the "Baldwin" low water mark determined in 1846. This reference is commonly accepted as authoritative. *Wheeler v. Stone*, 1848, 1 Cush. 313, 323; *Boston Waterfront Development Corp. v. Commonwealth*, 378 Mass. 629, 1979 Mass. Adv.Sh. 1992, 1993 n.1, 393 N.E.2d 356.

agencies' in effect at this date of April 10, 1981." The Code of Federal Regulations provides that the taken land will be offered first to the Commonwealth before it can be offered for sale to private individuals. The stipulation, the order of distribution, and the judgment were entered by the court on April 16, 1981, and the case was duly closed.

All parties, however, assented to the Government's motion to vacate judgment and order for distribution which was filed on April 27, 1981. The United States claimed, at the hearing held on May 26, 1981, that it was entitled to a full fee simple title, without any restriction or limitation, and that the stipulation and judgment as entered were unacceptable. We allowed the motion to vacate on May 26, 1981, whereupon the United States filed a motion to dismiss the answer and counterclaim of the Commonwealth at the close of the hearing. We heard oral arguments on the merits of the Commonwealth's objection on June 2, 1981.

■ The principal argument made on behalf of the United States in response to the Commonwealth's objection is that since the Commonwealth concedes that the use in connection with the Coast Guard Support Center is a public use, nothing remains for this court to review. *Ledford v. Corps of Engineers*, 6 Cir., 1974, 500 F.2d 26, 28. Further the Commonwealth's counterclaim and request for declaratory relief should likewise be dismissed, since the only pleading permitted in response to a complaint in condemnation is an answer. *United States v. 6,321 Acres of Land*, 1 Cir., 1973, 479 F.2d 404, 406; Fed.R.Civ.P. 71A(e). We agree with the United States' argument that the counterclaim and request for declaratory relief should be, and is hereby dismissed. However, we find that the Commonwealth's answer properly raises its objection to the taking.

■ The Commonwealth's admission that improvement of the Coast Guard Support Center is a public use does not foreclose

judicial review of this taking. First, the Commonwealth's objection is directly concerned with the public use of the condemned land. Its concern is that the taking would permit an eventual private use of land below the low water mark which, by its inherent and peculiar nature, is forever impressed with a public trust. The language of the Declaration specifying "and such other uses as may be authorized by Congress or by Executive Order" permits an initial public use to be followed by disposal to private individuals for private uses. *See* 41 C.F.R. § 101047.303.2 (1980); *see also* 40 U.S.C. § 258f. Second, the Commonwealth contends that the language of the Declaration, permitting an eventual private use of the land, is in this case beyond the scope and purpose of the Declaration of Taking Act, 40 U.S.C. § 258a.[2] This is also an objection properly raised by the Commonwealth's answer. *See Washington Metropolitan Area Transit Authority v. One Parcel of Land*, D.C.Cir., 1975, 514 F.2d 1350, 1352.

The oral arguments of the parties on May 26, 1981, led to a crystalization of the Commonwealth's objection. The issue is whether or not the United States may take a full fee simple title to land below the low water mark without destroying the perpetual public trust impressed upon that land. If it cannot, then serious constitutional and statutory questions are raised concerning the power of the federal government to destroy forever an important aspect of the Commonwealth's sovereignty. We hold, however, that the United States may obtain full fee simple title to land below the low water mark without destroying the public trust which is administered by both the federal and state sovereigns.

Public trust theory has its roots in the Roman law. For centuries, land below the low water mark has been recognized as having a peculiar nature, subject to varying degrees of public demand for rights of navigation, passage, portage, commerce, fishing, recreation, conservation and aesthetics.

---

2. The complaint cites various other statutory provisions in support of the authorization for

the taking, but in view of this decision none of these are relevant.

*See* Note, *The Public Trust in Tidal Areas: A Sometime Submerged Traditional Doctrine*, 79 Yale L.J. 762, 777–778 (1970). Historically, no developed western civilization has recognized absolute rights of private ownership in such land as a means of allocating this scarce and precious resource among the competing public demands. Though private ownership was permitted in the Dark Ages, neither Roman Law nor the English common law as it developed after the signing of the Magna Charta would permit it. *Boston Waterfront Development Corporation v. Commonwealth*, 378 Mass. 629, 1979 Mass.Adv.Sh. 1992, 1994–1996, 393 N.E.2d 356; Note, *supra*, at 772–774. The common law held that rights to property below the high water mark were divided into two categories: "a proprietary jus privatum, or ownership interest, and a governmental jus publicum, by which the king held the land in his sovereign capacity as a representative of all the people." *Boston Waterfront Development Corporation, supra*, 1979 Mass.Adv.Sh. at 1995; *see Shively v. Bowlby*, 1894, 152 U.S. 1, 11–14, 14 S.Ct. 548, 551–553, 38 L.Ed. 331. The king could convey the *jus privatum*, but could not convey the *jus publicum* because this interest was held in trust for all the people. Since Parliament eventually took control of the *jus publicum*, while the king retained the *jus privatum*, neither could convey a free and clear title to a private individual. *Boston Waterfront Development Corporation, supra*, 1979 Mass.Adv.Sh. at 1996; *see Martin v. Waddell*, 1842, 41 U.S. [16 Pet.] 367, 410, 10 L.Ed. 997.

The division of public rights and private rights in tideland and land below the low water mark continued in this country by virtue of the adoption of the English common law. However, our federal system of dual sovereignty has required a number of modifications of the common law public trust theory. In 1892, the United States Supreme Court explained the status of the doctrine:

> It is the settled law of this country that the ownership of and dominion and sovereignty over lands covered by tide waters, within the limits of the several States, belong to the respective States within which they are found, with the consequent right to use or dispose of any portion thereof when that can be done without substantial impairment of the interest of the public in the waters, and subject always to the paramount right of Congress to control their navigation so far as may be necessary for the regulation of commerce with foreign nations and among the States.

*Illinois Central Railroad v. Illinois*, 1892, 146 U.S. 387, 435, 13 S.Ct. 110, 111, 36 L.Ed. 1018. This formulation recognizes the division of sovereignty between the state and federal governments—those aspects of the public interest in the tideland and the land below the low water mark that relate to the commerce and other powers delegated to the federal government are administered by Congress in its capacity as trustee of the *jus publicum*,[3] while those aspects of the public interest in this property that relate to non-preempted subjects reserved to local regulation by the states are administered by state legislatures in their capacity as co-trustee of the *jus publicum*.

The problems that have arisen by the administration of the *jus publicum* in our system of dual sovereignty must further account for the supremacy of the federal government over those matters within its powers.[4] For example, when oil was dis-

---

**3.** "The United States holds [such] resources . . . in trust for its citizens in one sense, but not in the sense that a private trustee holds for a *cestui que trust*. The responsibility of Congress is to utilize the assets that come into the hands of the sovereign in the way that it decides is best for the Nation." *Alabama v. Texas*, 1953, 347 U.S. 272, 277, 74 S.Ct. 481, 483, 98 L.Ed. 689 (Black, J., dissenting).

**4.** An explicit power of the federal government found in the commerce clause of the Constitution is its dominant navigational servitude. "The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States . . . . For this purpose they are the public property of the nation, and subject to all the requisite legislation by Congress." *United States v. Rands*, 1967, 389 U.S.

covered off the California coast within the three mile limit, the Supreme Court had to decide whether the state or federal government had the right to take or to authorize the taking of the oil beneath the submerged land. *United States v. California*, 1947, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889. The Court held that California did not own the land within the three mile limit, *id.* at 29–39, 67 S.Ct. at 1663–1668, and that the federal government has "paramount rights" in the land, *id.* at 34–38, 67 S.Ct. at 1668. The focus of the Court's opinion was on the value of the three mile belt along the coast to the national security and the sovereign federal function of protecting and controlling our national borders, *id.* at 33–35, 67 S.Ct. at 1665–1666, but the Court did *not* conclude that the federal government owned the land.[5] How the Court resolved this dispute as it relates to federal or state control of the *jus privatum* in the submerged land is not significant; rather what is significant here is the Court's recognition of the *jus publicum* and the nature of the trust administered by the state and federal governments. "The Government, which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property . . . ." *Id.* at 40, 67 S.Ct. at 1669.

■ Neither the federal government nor the state may convey land below the low water mark to private individuals free of the sovereign's *jus publicum.* Moreover, the state's administration of the public trust is subject to the paramount rights of the federal government to administer its trust with respect to matters within the federal power. The trust is of such a nature that it can be held only by the sovereign, and can only be destroyed by the destruction of the sovereign.

The trust devolving upon the State [or the federal government] for the public, and which can only be discharged by the management and control of the property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the State for the purposes of the trust can never be lost . . . . The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties . . . than it can abdicate its police powers in the administration of government and the preservation of the peace.

*Illinois Central Railroad, supra,* 146 U.S. at 452–453, 13 S.Ct. at 117–118. Since the trust impressed upon this property is governmental and administered jointly by the state and federal governments by virtue of their sovereignty, neither sovereign may alienate this land free and clear of the public trust. When the federal government takes such property by eminent domain, however, the federal government obtains the fullest fee that may be had in land of this peculiar nature: the *jus privatum* and the federal government's paramount *jus publicum.*

■ Therefore we hold that the federal government may take property below the low water mark in "full fee simple" insofar as no other principal may hold a greater

121, 122–123, 88 S.Ct. 265, 266, 19 L.Ed.2d 329 *citing Gilman v. Philadelphia*, 1866, 3 Wall. 713, 724–725.

5. To the extent that *United States v. California, supra* held that the state had no claim to ownership of the petroleum resources beneath submerged land within three miles of the coastline, Congress overturned the decision by legislating the Submerged Lands Act, 43 U.S.C. § 1311 on May 22, 1953. Congress intended to restore submerged offshore land and its resources to the states. *United States v. Alaska*, 1975, 422 U.S. 184, 187, 95 S.Ct. 2240, 2245, 45 L.Ed.2d

109; *United States v. Maine*, 1975, 420 U.S. 515, 95 S.Ct. 1155, 43 L.Ed.2d 363.

It is not clear that *United States v. California* was founded on the federal government's claim to private rights of ownership of the oil. "[A]lthough *dominium* and *imperium* are normally separable and separate, this [*U. S. v. California*] is an instance where property interests are so subordinated to the rights of sovereignty as to follow sovereignty." *United States v. Texas*, 1949, 339 U.S. 707, 719, 70 S.Ct. 918, 924, 94 L.Ed. 1221.

right to such land. It must be recognized, however, that the federal government is as restricted as the Commonwealth in its ability to abdicate to private individuals its sovereign *jus publicum* in the land. So restricted, neither the Commonwealth's nor the federal government's trust responsibilities are destroyed by virtue of this taking, since neither government has the power to destroy the trust or to destroy the other sovereign. Accordingly, we grant the United States' motion to dismiss the Commonwealth's answer and counterclaim. There being no opposition filed, we further grant the owner's motion for summary judgment filed November 28, 1980, since the Commonwealth's interest in this land is too remote to be compensable.