2005 ME 109

**John S. NORTON Jr.**

v.

**TOWN OF LONG ISLAND et al.**

Supreme Judicial Court of Maine.

Argued: May 17, 2005.

Decided: Oct. 11, 2005.

John S. Campbell (orally), Campbell & Associates, P.A., Portland, for plaintiff.

Paul R. Johnson (orally), Richardson, Whitman, Large & Badger, P.C., and Robert J. Crawford, Bernstein, Shur, Sawyer & Nelson, P.A., Portland, for defendant, Town of Long Island.

G. Steven Rowe, Atty. Gen., Dennis J. Harnish, Asst. Atty. Gen. (orally), Paul Stern, Deputy Atty. Gen., Augusta, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, and LEVY, JJ.*

SAUFLEY, C.J.

[¶ 1] John S. Norton Jr. appeals from the dismissal by the Superior Court (Cumberland County, *Crowley, J.*) of his claim against the Town of Long Island to quiet

---

* Justice Paul L. Rudman sat at oral argument and participated in the initial conference, but retired before this opinion was certified.

title to two roads that run through his property and from its declaration in his quiet title claim against the State of Maine and the Town of Long Island that he lacks any ownership interest in the submerged land known as a "small boat pool," which is located in Casco Bay adjacent to his Long Island property. Norton argues that the doctrine of res judicata does not bar his claim to quiet title to the roads and that the United States government had the authority to convey to him the submerged land comprising the small boat pool free of any public trust. We conclude, as did the Superior Court, that Norton's predecessor in interest took the small boat pool subject to the public trust held by the State, but we agree with Norton that the doctrine of res judicata does not bar his claim to quiet title to the roads. Accordingly, we affirm the judgment in part and vacate in part.

## I.  BACKGROUND

[¶ 2] The present dispute arises from the federal government's conveyance to John S. Norton Sr. of property obtained by the United States Navy through condemnation in the 1940s. At that time, preparatory to World War II, the United States government acquired by condemnation certain property on Long Island where it constructed and operated a Naval fuel annex. One of the piers within this property, known as Pier H, extended from the land into Casco Bay. Adjacent to Pier H was an angled breakwater. These structures, along with one or more wooden docks or other wooden structures enclosed an area known as a small boat pool. While the Navy had possession of the land, it guarded access to the small boat pool by sea and by land.

[¶ 3] Through a 1942 order, the United States obtained possession of the land "described in the Petition for Condemnation." The petition described the land as being bound on the shore by the "ordinary high water mark of Casco Bay." The petition listed thirteen individual owners from whom the land was to be taken and indicated that "the City of Portland, the County of Cumberland and the State of Maine may have or claim to have some interest in and to said lands." The subsequent declaration of taking and the judgment on that declaration [1] provided the same description of the boundary on the shore, but added that the property was to be taken in fee simple, "including the abutting rights in and to the boundary streets, riparian rights, and all right, title and interest in the adjacent submerged lands." The judgment on the declaration of taking does not list the parties from whom the land was taken. The final judgment as to the tracts taken, entered on April 6, 1945, stated that the United States obtained "full fee simple title (including, the abutting rights in and to the boundary streets, riparian rights, and all right, title and interest in the adjacent submerged lands ...)." The parties listed in the judgment as having been compensated for the taking were four individuals, a community club, and the City of Portland.

[¶ 4] After the war, the United States conveyed the land to John S. Norton Sr. and Peter K. Lannon by a 1964 quitclaim deed without covenant that described the boundary as being "along the [ordinary] high water mark of Casco Bay and along the shore line of Long Island." The United States also executed a quitclaim "confirmatory deed" without covenant in 1965; it was issued "to correct and confirm the

---

1.  The judgment was entered by the United States District Court for the District of Maine

*(Peters, J.)* on March 31, 1943.

deed of February 14, 1964 between the parties herein by including the exceptions and reservations ... which exceptions and reservations were erroneously omitted from the original deed." The language describing the border along the shoreline was identical to the language in the original deed.[2] The 1965 deed reserved to the United States and its assigns, however,

for the benefit of its remaining land the right to use and maintain, in common with all others entitled thereto, for all purposes for which streets or ways are now or may hereafter be used in the City of Portland, Maine those ways known as Island Avenue and Marginal Street located within the above-described Parcel.

[¶ 5] After purchasing the property from the United States, John S. Norton Sr. considered the small boat pool to be his exclusive property. Both he and his son exercised control over the property consistent with ownership, but neither the City of Portland nor the Town of Long Island acceded to the Nortons' ownership.

[¶ 6] It was not until October 22, 1986, that John S. Norton Sr. and Mary L. Norton, as joint tenants, obtained a deed from the United States that stated, "It was the intent of the Grantor herein to convey the said Pier 'H' and breakwater in the aforesaid deed of May 28, 1965."

[¶ 7] In April 1989, John S. Norton Sr. and Mary L. Norton obtained yet another deed from the United States that was "intended to clarify [the] two prior deeds" from 1965 and 1986. The deed granted all interests described in the prior deeds "and consisting of submerged land adjacent to a parcel of property and bulkhead, said property formerly being a part of the U.S.

Naval Fuel Annex situated on Long Island."

[¶ 8] In 1988, John S. Norton Sr. commenced an action in the United States District Court for the District of Maine alleging that the City of Portland (which at the time contained Long Island) had violated his Fourteenth Amendment rights by using the roads for travel and parking, and by encouraging others to do so. Upon the parties' cross motions for summary judgment, the United States Magistrate Judge (Cohen, M.J.) recommended that the City's motion be granted for multiple reasons. The magistrate concluded that Norton Sr. failed to plead a procedural due process claim properly, but further stated that, even if Norton Sr. had pleaded the claim properly, his remedy would be a post-deprivation remedy, such as bringing a quiet title action, not a pre-deprivation process. The magistrate specifically stated that Norton Sr. "could have brought a quiet title action," and that he could have minimized damages "had he pursued available state law remedies to clarify and enforce his rights when the parking first began to be a problem in July 1986." The magistrate also concluded that the complaint had pleaded substantive due process and equal protection claims, but that no violations existed based on the summary judgment record.

[¶ 9] The United States District Court (Carter, J.), upon the recommendation of the magistrate judge, granted a summary judgment in favor of the City. The court concluded that Norton Sr. failed to establish a procedural due process remedy, could not therefore sustain a substantive due process claim, and could not succeed on his equal protection claim because the City had a rational basis for regarding the streets as public ways. The court further

2. The deed describes the border as being "along the [ordinary] high water mark of Cas-

co Bay and along the shore line of Long Island."

stated that the issues presented "depend[ed] upon the legal rights of the parties which are traditionally resolved under state law," and that "a healthy sense of federal-state comity dictates that the resolution of [the title] issues should be left to the state courts, which are better positioned to definitively adjudicate them." The court explicitly stated that the decision of the city manager to allow travel and parking was "in no sense an adjudication of the status of Plaintiff's title to the real estate," and the city manager's "decision to leave [Norton Sr.] to the invocation of his legal rights and remedies was an option legitimately open to him." As a result, the decision of the city manager "cannot be taken to be a deprivation of any constitutionally secured right, immunity, or privilege of the Plaintiff."

[¶ 10] In 1996, this time without the benefit of an attorney's assistance, Norton Sr. filed a nearly identical federal complaint against the Town of Long Island. Upon motion by the Town of Long Island, the United States District Court for the District of Maine (*Hornby, J.*) granted a summary judgment on the basis of res judicata and collateral estoppel because of the earlier federal claim.

[¶ 11] In 2002, John S. Norton Sr. commenced the present action against the State of Maine and the Town of Long Island seeking to quiet title to the small boat pool and the portions of Island Avenue and Marginal Street that run through his property, which he contends are not public ways. As amended, Norton Sr.'s complaint alleged the following claims: quiet title to Island Avenue and Marginal Street against the Town (count one), quiet title to the submerged lands against the Town (count two), damages for the Town's

alleged taking without just compensation (count three), and quiet title to the submerged lands against the State (count four).

[¶ 12] Upon a motion by the Town, the court dismissed count one seeking to quiet title to the portions of Island Avenue and Marginal Street that ran through his property based on the doctrine of res judicata. The court reasoned that Norton Sr. should have prosecuted his quiet title action in conjunction with the 1988 federal court complaint he filed that alleged the violation of his Fourteenth Amendment rights based on municipal encouragement of the public use of the two roads.[3]

[¶ 13] Upon John S. Norton Sr.'s death, John S. Norton Jr. successfully moved to be substituted as the plaintiff in 2004. The remaining counts thereafter proceeded to a bench trial. The court issued a judgment in favor of the Town of Long Island and the State of Maine on all counts. Although the court concluded that the 1989 deed was not void and that the federal government had intentionally condemned the submerged lands during World War II, the court ultimately concluded that Norton did not own the submerged lands because the United States lacked the authority to convey the submerged lands to his father free from the State's public trust interest. The court clarified, on Norton's motion to alter or amend the judgment, that Norton does have title to the breakwater. Norton timely appealed.

## II. DISCUSSION

### A. Title to Island Avenue and Marginal Street

[¶ 14] According to Norton, the earlier judgments left open his opportunity to

3. Following the dismissal of the count seeking to quiet title to the roads and the corresponding claim for damages, Norton Sr. appealed to this Court. We dismissed the appeal as an interlocutory appeal not subject to any exceptions to the final judgment rule. *Norton v. Town of Long Island,* 2003 ME 25, 816 A.2d 59.

bring claims in state court to quiet title to the relevant portions of Island Avenue and Marginal Street, and to establish damages. He contends that the United States District Court declined jurisdiction over the issue of title, thereby declining supplemental jurisdiction.

[¶ 15] The Town contends that the District Court would have asserted supplemental jurisdiction over Norton Sr.'s quiet title claim if he had pursued it in his initial federal proceeding because the federal claim and the current state claim share a "nucleus of operative facts." Further, the Town argues, the judgment did not indicate that it was entered without prejudice and did not contain any equivalent language.

[¶ 16] We review a dismissal on the ground of res judicata de novo for errors of law. *Town of Boothbay v. Jenness*, 2003 ME 50, ¶ 19, 822 A.2d 1169, 1175.

[¶ 17] Claim preclusion, which is the relevant component of the res judicata doctrine, "bars relitigation if: (1) the same parties or their privies are involved in both actions; (2) a valid final judgment was entered in the prior action; and (3) the matters presented for decision in the second action were, or might have been litigated in the first action." *Macomber v. MacQuinn–Tweedie*, 2003 ME 121, ¶ 22, 834 A.2d 131, 139 (quotation marks omitted). The doctrine prevents a party from relitigating "issues that were tried, or that may have been tried, between the same parties or their privies in an earlier suit on the same cause of action." *Blance v. Alley*, 1997 ME 125, ¶ 4, 697 A.2d 828, 829 (quotation marks and emphasis omitted).

[¶ 18] In determining whether a claim is precluded, we apply a transactional test, examining the "aggregate of connected operative facts that can be handled together conveniently for purposes of trial" to determine "if they were founded upon the same transaction, arose out of the same nucleus of operative facts, and sought redress for essentially the same basic wrong." *Draus v. Town of Houlton*, 1999 ME 51, ¶ 8, 726 A.2d 1257, 1260 (quotation marks omitted). In such circumstances, the newly pleaded claim is precluded even if the latest suit " 'relies on a legal theory not advanced in the first case, seeks different relief than that sought in the first case, or involves evidence different from the evidence relevant to the first case.' " *Blance*, 1997 ME 125, ¶ 4, 697 A.2d at 829 (quoting *Petit v. Key Bancshares of Me., Inc.*, 635 A.2d 956, 959 (Me.1993)); *see also Harriman v. Border Trust Co.*, 2004 ME 28, ¶ 5, 842 A.2d 1266, 1267. Claim preclusion does not, however, apply when a court "reserves a party's right to maintain a second action, as happens when a court dismisses a claim without prejudice." *Pascoag Reservoir & Dam, LLC v. Rhode Island*, 217 F.Supp.2d 206, 213 (D.R.I.2002).

[¶ 19] The question, then, is whether either of the federal court actions could have resolved a quiet title action had Norton's father included such a claim in his complaints. "The federal district courts have the power to determine state law claims that arise from the common nucleus of operative facts that constitute the federal law claims." *Draus*, 1999 ME 51, ¶ 7, 726 A.2d at 1260. Arguments "that the federal court was not required to exercise its supplemental jurisdiction ... have met with little sympathy." *Id.* ¶ 7 n. 3, 726 A.2d at 1260.[4] If, however, it is clear that

---

4. By statute, a federal court "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Consti-

the federal court would have declined to exercise supplemental jurisdiction in the earlier proceeding, the subsequent state claim is not precluded. RESTATEMENT (SECOND) OF JUDGMENTS § 25 cmt. e (1982) (stating that, as between federal and state courts, if the court considering the first action would clearly have declined to exercise jurisdiction over a claim as a matter of discretion, the claim is not precluded in the second court); *see Waterville Indus., Inc. v. Fin. Auth. of Me.,* 2000 ME 138, ¶ 19, 758 A.2d 986, 991 (citing *First Interstate Bank v. Cent. Bank & Trust Co.,* 937 P.2d 855, 858 (Colo.Ct.App.1996)).

■ [¶ 20] We conclude that the federal court would have declined to exercise jurisdiction over a quiet title claim. The United States District Court articulated an intention that Norton Sr.'s title question remain a live issue for the State to address in the future: "the resolution of [the title] issues should be left to the state courts, which are better positioned to definitively adjudicate them." Because the District Court so strongly indicated that it would decline supplemental jurisdiction based on "a healthy sense of federal-state comity," we conclude that the matter presented for discussion here—the title to the roads— could not have been litigated in the federal proceeding and therefore the doctrine of res judicata does not bar Norton's claim to quiet title to the roads at issue. *See Waterville Indus., Inc.,* 2000 ME 138, ¶ 19, 758 A.2d at 991 (citing *First Interstate Bank,* 937 P.2d at 858); RESTATEMENT (SECOND) OF JUDGMENTS § 25 cmt. e. Accordingly, we must vacate the court's dismissal of the claim to quiet title to the roadways (count one), and the corresponding claim for damages (count three) to the extent that those alleged damages arise from the facts alleged in count one.[5]

## B. Interests in the Submerged Lands

■ [¶ 21] In addressing Norton's claims to the submerged lands, we must first determine whether the court properly concluded that the federal government obtained title to the small boat pool through condemnation and conveyed title to the pool to Norton's father. Submerged lands are unique because of their usefulness to the public for fishing and navigation. *See Idaho v. United States,* 533 U.S. 262, 272, 121 S.Ct. 2135, 150 L.Ed.2d 326 (2001); *Opinion of the Justices,* 437 A.2d 597, 607 (Me.1981). Such lands are traditionally held by the State in trust for the public to use for fishing and navigation. *Ill. Cent. R.R. Co. v. Illinois,* 146 U.S. 387, 455–57, 13 S.Ct. 110, 36 L.Ed. 1018 (1892).

---

tution." 28 U.S.C.A. § 1367(a) (West 1993). There are certain exceptions contained in the statute:

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

*Id.* § 1367(c).

5. Because the parties' respective property rights in the roads have not yet been considered by the Superior Court, we do not discuss or interpret the provisions in the federal government's deeds to John S. Norton Sr. that except and reserve to the United States "the right to use and maintain, *in common with all others entitled thereto,* for all purposes for which streets or ways are now or may hereafter be used in the City of Portland, Maine those ways known as Island Avenue and Marginal Street located within the ... [p]arcel." (Emphasis added.)

[¶ 22] The present case presents a unique situation; the federal government took submerged lands from the State and from individuals. To effect a taking, the federal government was required to expressly describe the interest or interests taken. Declaration of Taking Act, Pub.L. No. 71–736, ch. 307, 46 Stat. 1421 (1931) (codified as amended at 40 U.S.C.A. § 3114 (West 2005)). We must therefore apply the law in effect at the time of the taking to determine first, whether the federal government took title to the land and second, whether the property interests swept into the taking included the public's trust interest in the land. If the federal government did not take the State's public trust interest, we must determine whether Norton lacks a title interest in the land, or rather holds title, but lacks the ability to exclude the public from entering for purposes of fishing and navigation.

1. Whether the Federal Government Obtained and Conveyed Title to the Small Boat Pool

[¶ 23] "[T]he plaintiff in a quiet title action has the burden of proving better title than that of the defendant." *Hodgdon v. Campbell*, 411 A.2d 667, 671 (Me.1980). To accomplish this goal in the present case, Norton was required to establish a valid chain of title, including a valid taking by condemnation by the United States. The determination of property boundaries based on the language of a deed presents a question of law that we review de novo. *McGeechan v. Sherwood*, 2000 ME 188, ¶ 24, 760 A.2d 1068, 1075. If the language is ambiguous, the rules of construction apply and the court may examine extrinsic evidence. *Id.* In such circumstances, we review the trial court's findings regarding extrinsic evidence for clear error. *Thompson v. Rothman*, 2002 ME 39, ¶ 8, 791 A.2d 921, 924.

[¶ 24] There is no question that the federal government may take property through condemnation proceedings. "[T]he United States may take property pursuant to its power of eminent domain in one of two ways: it can enter into physical possession of property without authority of a court order; or it can institute condemnation proceedings under various Acts of Congress providing authority for such takings." *United States v. Dow*, 357 U.S. 17, 21, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958). In either instance, title passes to the United States when the owner receives compensation or when the United States deposits the compensation into court. *Id.* at 21–22, 78 S.Ct. 1039.

[¶ 25] In the present case, the federal government employed a condemnation proceeding to obtain title to the land. At the time of the wartime condemnation in the present case, the United States government was operating pursuant to the Second War Powers Act of 1942, Public Law Number 77–507, ch. 199, § 201, 56 Stat. 176, 177 (repealed 1947), which granted the power to the Secretary of the Navy to

acquire by purchase, donation, or other means of transfer, or [to] cause proceedings to be instituted in any court having jurisdiction of such proceedings, to acquire by condemnation, any real property, temporary use thereof, or other interest therein ... that shall be deemed necessary, for military, naval, or other war purposes ....

A separate Public Law made clear that the Secretary of the Navy was "authorized to establish or develop [certain] naval shore activities by the construction of such temporary or permanent public works as he may consider necessary." Act of Apr. 28, 1942, Pub.L. No. 77–531, ch. 250, 56 Stat. 248. The Declaration of Taking Act in effect at the time, Pub.L. No. 71–736, ch. 307, 46 Stat. 1421, required the filing of a

declaration of taking that contained, among other things, a description of the land that was sufficient to identify it, a plan showing the land taken, and a statement of the amount estimated for just compensation. *Id.*

[¶ 26] Most defects in a declaration of taking are not fatal to a taking pursuant to the Act. *See, e.g., United States v. 125.2 Acres of Land,* 732 F.2d 239, 242–43 (1st Cir.1984) (stating that personal notice is not required for a taking to be effective and that takings in advance of compensation do not violate due process); *United States v. Haddon,* 550 F.2d 677, 680–81 (1st Cir.1977) (stating that a failure of notice does not void the United States' taking, but may give rise to a claim for damages); *Long v. Area Manager, Bureau of Reclamation,* 236 F.3d 910, 914 (8th Cir.2001) (same). A condemnation may be held to be void, however, if the condemnation court never obtained in rem jurisdiction because of an inaccurate or misleading description and a failure to seize the land. *United States v. Chatham,* 323 F.2d 95, 100 (4th Cir.1963). "It would be establishing a dangerous precedent to permit the Government in a condemnation proceeding, which is purely statutory and strictly construed, to condemn one's property without clearly and unmistakably describing all of that portion sought to be condemned ...." *United States v. 5.324 Acres of Land,* 79 F.Supp. 748, 762 (S.D.Cal.1948).

[¶ 27] In the present case, the declaration of taking described the condemnation of the upland property and "adjacent submerged lands." This description is ambiguous because it does not describe the boundaries of the submerged land or explicitly address the public trust interest also at issue here. When interpreting documents that are ambiguous, it is appropriate to examine extrinsic evidence; we re-

view the factual findings regarding the extrinsic evidence for clear error. *McGeechan,* 2000 ME 188, ¶ 24, 760 A.2d at 1075; *Thompson,* 2002 ME 39, ¶ 8, 791 A.2d at 924.

[¶ 28] The trial court found that the evidence presented established the United States' occupation of the small boat pool and demonstrated its intention to take it. Specifically, the court found that the small boat pool, set off by Pier H and the breakwater, was guarded and regulated exclusively by the Navy. The trial record amply supports the court's factual finding that, in addition to the language of the condemnation documents, "the federal government's occupation of the submerged lands evidences its intention to take the lands." *See Thompson,* 2002 ME 39, ¶ 8, 791 A.2d at 924. In sum, in light of the Navy's overt sequestration and use of the submerged land, the description of the property to include "adjacent submerged lands" cannot be regarded as inaccurate or misleading and hence does not run afoul of the Declaration of Taking Act, Pub.L. No. 71–736, ch. 307, 46 Stat. 1421, in effect at the time of the taking. *Compare with Chatham,* 323 F.2d at 100; *United States v. 5.324 Acres of Land,* 79 F.Supp. at 762.

[¶ 29] Accordingly, the United States did obtain title to the small boat pool through condemnation and could convey it to Norton's father. Through its initial deed and the series of confirmatory deeds that followed, the federal government accomplished this land transfer. Ultimately, however, because Norton, through the present action, seeks to exclude the public from his property, we must also address whether the State's public trust easement in the small boat pool survived the condemnation and subsequent transfer of these submerged lands.

2. Whether Title to the Submerged Lands is Subject to the State's Public Trust Easement

[¶ 30] As we have observed, at the time of the taking, the United States had the power to obtain interests in real property by condemnation and to construct public works as necessary. *See* Act of Apr. 28, 1942, Pub.L. No. 77–531, ch. 250, 56 Stat. 248; Second War Powers Act of 1942, Pub.L. No. 77–507, ch. 199, § 201, 56 Stat. at 177; Declaration of Taking Act, Pub.L. No. 71–736, ch. 307, 46 Stat. 1421. We must determine whether the federal government achieved the separate taking of the State's public trust interest in the small boat pool.

[¶ 31] Because navigable waters are of great importance to the public, ownership of the submerged lands underlying those waters is " 'strongly identified with the sovereign power of government.' " *Idaho v. United States,* 533 U.S. at 272, 121 S.Ct. 2135 (quoting *Montana v. United States,* 450 U.S. 544, 552, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981)); *see also Ill. Cent. R.R. Co.,* 146 U.S. at 455–56, 13 S.Ct. 110. Historically, as the United States grew, it regarded newly obtained lands under navigable waters as being " 'held for the ultimate benefit of future States.' " *Idaho v. United States,* 533 U.S. at 272, 121 S.Ct. 2135 (quoting *United States v. Holt State Bank,* 270 U.S. 49, 55, 46 S.Ct. 197, 70 L.Ed. 465 (1926)).

[¶ 32] For their part, the states have traditionally held these submerged lands in trust for the public. *Ill. Cent. R.R. Co.,* 146 U.S. at 455–56, 13 S.Ct. 110. Title to such lands could be divested to an individual, but would remain subject to the public trust. *Id.* at 456–58, 13 S.Ct. 110. In Maine, this public trust is in the nature of an easement that preserves for the public the "rights of fishing and navigation." *Opinion of the Justices,* 437 A.2d at 605. Accordingly, the State held two separate interests and could convey the *jus privatum,* or the private right to title, but that title was subject to the *jus publicum,* or the public right of fishing and navigation, unless those rights were expressly limited or extinguished by the State. *See Opinion of the Justices,* 437 A.2d at 605–07; *see also United States v. 1.58 Acres of Land,* 523 F.Supp. 120, 124–25 (D.Mass.1981); *but see United States v. 11.037 Acres of Land,* 685 F.Supp. 214, 216–17 (N.D.Cal. 1988) (declining to follow the reasoning of *1.58 Acres of Land* and holding that the public trust easement was extinguished by the federal taking).

[¶ 33] The small boat pool at issue in the present case incorporates both the intertidal zone abutting Norton's land (i.e., the zone between the high tide and low tide marks) and submerged lands beyond the intertidal zone.[6] Pursuant to Maine

---

**6.** Historically, state law has governed all title interest in the submerged lands within a state below the high tide mark, subject to the rights granted to the federal government by the Constitution. *See State v. Bayou Johnson Oyster Co.,* 130 La. 604, 58 So. 405, 407 (1912), and cases cited therein. Maine, unlike most states, permits private ownership of the zone between the high tide and low tide marks by the owners of abutting private lands, subject to a limited public easement. *Bell v. Town of Wells,* 510 A.2d 509, 514–15 (Me.1986). This rule of law distinguishes Maine from other states, most of which vest title to the intertidal zone in the state. *See Shively v. Bowlby,* 152 U.S. 1, 18–26, 14 S.Ct. 548, 38 L.Ed. 331 (1894); *see also* Jose L. Fernandez, *Untwisting the Common Law: Public Trust and the Massachusetts Colonial Ordinance,* 62 Alb. L. Rev. 623, 635 (1998). We later clarified the limited nature of that public trust easement, thereby restricting the range of the public's use of intertidal lands. *See Bell v. Town of Wells,* 557 A.2d 168, 173 (Me.1989) (rejecting a general recreational easement for the public); *see also Great Cove Boat Club v. Bureau of Pub. Lands,* 672 A.2d 91, 95 (Me.1996)

law, both types of submerged lands are normally subject to a public trust easement. *See Bell v. Town of Wells*, 510 A.2d 509, 514–16 (Me.1986); *Opinion of the Justices*, 437 A.2d at 607 (stating that "intertidal and submerged lands are impressed with a public trust, a principle that reflects the unique public value of those lands"); *People v. Steeplechase Park Co.*, 218 N.Y. 459, 113 N.E. 521, 524 (1916) ("In this country the state has succeeded to all the rights of both crown and Parliament in the navigable waters and the soil under them . . . .").

[¶ 34] When the government commenced its condemnation proceeding to take the small boat pool, the Declaration of Taking Act, Pub.L. No. 71–736, ch. 307, 46 Stat. 1421, governed the process by which a taking could be achieved through condemnation. Although in general, the United States' exercise of eminent domain creates "a new title and extinguishes all previous rights," *A.W. Duckett & Co. v. United States*, 266 U.S. 149, 151, 45 S.Ct. 38, 69 L.Ed. 216 (1924), the United States may not take a state's interest in a condemned parcel except by stating so expressly in the condemnation proceeding, *see* Declaration of Taking Act, Pub.L. No. 71–736, ch. 307, 46 Stat. 1421 (requiring "[a] statement of the . . . interest in said lands taken") (codi-

fied as amended at 40 U.S.C.A. § 3114(a)(3)); *see also United States v. Chatham*, 323 F.2d at 100 (stating that a condemnation is void if the description was inaccurate or misleading).

[¶ 35] Because of the importance of the interest at issue, the United States' taking of the *jus privatum* through a condemnation of land cannot be understood to *implicitly* include a taking of a state's public trust interest in that land. *Cf. City of Alameda v. Todd Shipyards Corp.*, 635 F.Supp. 1447, 1450 (N.D.Cal.1986); *see also Opinion of the Justices*, 437 A.2d at 607. Here, because the description of the property does not include any mention of the public trust easement of the State, we will not imply a reference to that interest, and accordingly, we conclude the United States did not "take" the public trust easement and therefore never extinguished it by transferring it to a private individual.[7]

[¶ 36] The State was appropriately listed as a party to the condemnation proceeding because it held the *jus privatum* title to the submerged lands beyond the low tide mark until the taking. The inclusion of the State as a party did not, however, negate the requirement that the federal government be explicit about the nature of its taking. We will not read into the de-

---

(discussing the rights of riparian property owners, subject to the public trust easement). After World War II, Congress adopted the Submerged Lands Act of 1953, the relevant portions of which granted title to the states in the land beneath their navigable waters, preserving some rights in the federal government to use the submerged lands as necessary to secure the national defense. 43 U.S.C.A. §§ 1301–1315 (West 1986).

7. Because we conclude that the federal government did not intend to, or succeed in any effort to, condemn the public trust, we need not determine, as other courts have, whether the government *could* extinguish the trust. *Compare United States v. 11.037 Acres of Land,* 685 F.Supp. 214, 216–17 (N.D.Cal.1988)

(holding, pursuant to the Supremacy Clause of the United States Constitution, that the federal government may extinguish a state's public trust easement by exercising eminent domain), *with City of Alameda v. Todd Shipyards Corp.,* 635 F.Supp. 1447, 1450 (N.D.Cal. 1986) (holding that although the federal government may take the *jus publicum*, it may not permanently extinguish it and may not transfer it to a private party), and *United States v. 1.58 Acres of Land,* 523 F.Supp. 120, 124 (D.Mass.1981) (holding that neither the state nor the federal government may convey land below the low water mark to individuals free of the *jus publicum* because such a trust may only be held by the sovereign).

scription an intention to take the easement held by the State for the public. Accordingly, although the United States exercised its powers pursuant to the Property Clause of the United States Constitution, U.S. CONST., art. IV, § 3, cl. 2,[8] in deeding the land to Norton's father, the *jus privatum* interest it deeded remains subject to the State's public trust easement, the *jus publicum*, which allows the public to use the submerged lands for fishing and navigation.

[¶ 37] Through the application of the public trust doctrine in the present case, we have determined that Norton's title is subject to the State's public trust easement. This determination does not disrupt the chain of title established by Norton at trial. Norton holds *title* to the small boat pool, but his title is subject to the State's public trust easement permitting the public to use the small boat pool for fishing and navigation.[9] Accordingly, Norton may, as the holder of title to the submerged lands, limit access to his structures, but may not build or arrange them in a manner that unreasonably interferes with the public's right to fish and navigate in the waters. *See Opinion of the Justices*, 437 A.2d at 605; *State v. Wilson*, 42 Me. 9, 26–27 (1856). The parties do not dispute that Norton has title to the breakwater structure itself and possesses the right to exclude others from it.

[¶ 38] Because the judgment at issue articulated the State's public trust ease-

ment in the small boat pool as preventing Norton from having *title* to the pool, we clarify the judgment and remand for the entry of a judgment on count four quieting title in Norton, subject to the State's public trust easement.

The entry is:

Dismissal of count one (quiet title to Island Avenue and Marginal Street) vacated and remanded for further proceedings.

Judgment on count two (quiet title to the small boat pool against the Town of Long Island) affirmed.

Judgment on count three vacated as to any claim for damages arising from count one, but otherwise affirmed.

Judgment on count four vacated and remanded for entry of a judgment quieting title to the small boat pool in Norton, but subject to Maine's public trust easement.

---

8. "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. CONST., art. IV, § 3, cl. 2.

9. The public trust easement prevents Norton from excluding members of the public who wish to navigate or fish within the small boat pool. We have defined this easement over the course of years to include the right of mem-

bers of the public to sail over the lands, " 'moor their craft upon them,' " and " 'fish in the water over them.' " *Bell*, 557 A.2d at 174 (quoting *Marshall v. Walker*, 93 Me. 532, 536–37, 45 A. 497, 498 (1900)). In addition, the public trust restricts a landowner from "fill[ing] or build[ing] so as unreasonably to interfere with the public rights of navigation." *Opinion of the Justices*, 437 A.2d 597, 605 (Me.1981).